EARTH BURNERS, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 98–3C.

United States Court of Federal Claims.

April 21, 1999.

Robert C. Maki, Duluth, MN, for plaintiff.

Franklin Elgin White, Jr., U.S. Department of Justice, Washington, D.C., with whom were Assistant Attorney General Frank W. Hunger, Director David M. Cohen, and Deputy Director Sharon Y. Eubanks, for defendant. Edwin C. Bankston, Department of the Army, St. Paul District Corps of Engineers, of counsel.

## OPINION

FIRESTONE, Judge.

This case comes before the court on the parties' cross-motions for summary judgment. The dispute arises over a services contract for the removal, treatment, and disposal of waste material from two above-ground storage tanks at the Baudette Air Force Station in Minnesota. The issues under consideration are: (1) whether plaintiff is entitled to the unit price or its actual costs with respect to the materials it removed, treated, and disposed of from the two tanks; (2) whether defendant impermissibly terminated the contract for convenience in an effort to avoid paying the unit price for the removal, treatment, and disposal of the tank contents; and (3) whether plaintiff's failure to present a breakdown of its actual costs forecloses review of the contracting officer's final cost determination.

---

**FACTS**

This case arises from a fixed-price environmental services contract. The facts are not in dispute, unless otherwise noted. On May 18, 1995, the United States Army Corps of Engineers ("defendant") awarded Earth Burners, Inc. ("plaintiff") a contract with an estimated total value of $247,135.00 In general terms, the contract required plaintiff to "perform work associated with the removal/disposal of oil-filled electrical equipment, the closure of underground and above-ground storage tanks, and the removal and off-site disposal of contaminated soil and miscellaneous containerized wastes."

The contract contained the following standard clauses set forth in the Federal Acquisition Regulations ("FAR"): FAR 52.233–1 (Disputes—March 1994); FAR 52.236–2 (Differing Site Conditions—April 1984); FAR 52.249–3 (Termination for Convenience of the Government—April 1984). The contract also contained a "Variations in Estimated Quantities—Subdivided Items" ("VEQ") clause. The clause stated that it was only applicable to those contract line item numbers noted with an "AA" or "AB."

The portion of the contract giving rise to this dispute involves contract line item numbers 17AA and 17AB, relating to "Tanks 8 and 9 Sludge Removal/Disposal." In particular, Paragraph 8.3, Section 2NN of the contract specifications stated that:

> For bidding purposes, *the Contractor shall assume 2 inches of nonhazardous diesel product/sludge* is present at the bottom of each tank. Sampling and testing of Tanks 8 and 9 contents is optional and shall only be performed if ordered by the Contracting Officer. *If, through sampling and testing, the tanks are found to contain other than 2 inches of non-hazardous diesel product/sludge, compensation therefor shall be in accordance with SECTION 1: DIFFERING SITE CONDITIONS.* [1]

(emphasis added).

Paragraph 12.5, Section 2NN of the contract specifications went on to state that

---

1. The Differing Site Conditions Clause provided in relevant part that, "[t]he Contracting Officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, ... an equitable adjustment

"Sludge Removal/Disposal shall be measured by the pound, removed. Payment will include removal and disposal of sludge, product and wastewater existing in the tanks and cleaning of the tanks."

With respect to Tanks 8 and 9, plaintiff bid the first ten pounds of sludge to be disposed of at a unit price of $100.00 per pound. Plaintiff bid everything over ten pounds at a unit price of $10.00 per pound. Plaintiff's total proposal for removing and disposing of the government's estimated 150 pounds of sludge from Tanks 8 and 9 was $2,400.00.[2]

On July 17, 1995, after work began, plaintiff contacted defendant regarding the conditions at Tanks 8 and 9. Plaintiff and defendant's on-site representative learned on that date that Tank 8 had significantly less than two inches of contents and that Tank 9 had significantly more.

In plaintiff's July 27, 1995 letter to the defendant, plaintiff explained the situation as follows:

Earth Burners, Inc. contacted you in the A.M. on July 17, 1995, regarding existing conditions at Tanks 8 and 9. On this date you were informed that Tank # 9 had 10 inches of material in it and at which time, Bob Lamonds from your office, observed these conditions. This is approximately 4630 gallons. Additionally, Tank # 8 had approximately 150 gallons of tank contents and approximately 50 gallons of sand bags collected from within the tank.

*It is our opinion that both of these are differing site conditions based on the language in the contract. The contractor is told to assume 2" in each tank. In this case, Tank # 9 has significantly more contents while Tank # 8 has significantly less.*

This letter is notice that Earth Burners, Inc. is continuing with this project at this site in the same manner and method that this project was originally bid. *All quantities will continue to be verified in the field during our operations.*

(emphasis added).

Shortly thereafter, plaintiff and defendant disagreed over reimbursement for the work performed in connection with Tanks 8 and 9. Apparently, plaintiff asserted that it was entitled to the unit price for the material it removed, treated, and disposed of from the tanks under the VEQ—Subdivided Items clause. Defendant asserted that the Differing Site Conditions clause governed.

The dispute centered over whether the defendant had properly invoked the Differing Site Conditions clause under Paragraph 8.3, Section 2NN of the contract specifications. In particular, plaintiff asserted that the defendant could not rely on the Differing Site Conditions clause because defendant had failed to undertake the "testing" identified in Paragraph 8.3. Plaintiff argued that absent testing to confirm a differing site condition, plaintiff was entitled to the unit price under the VEQ—Subdivided Items clause. This disagreement led the government to suspend further work on the tanks on August 10, 1995. On August 16, 1995, the Contracting Officer stated in a letter to plaintiff that "because of the obvious difference between conditions indicated an[d] those experienced [at Tanks 8 and 9], ... testing of the material encountered was not required to determine the existence of a differing site condition." The Contracting Officer then stated:

You have indicated in previous conversations that you have collected over 6000/lbs of liquid (alleged to be sludge) from Tanks

shall be made under this clause...." FAR 52.236–2(b).

The proper measure of an equitable adjustment is reasonable costs, including reasonable profit for the work performed. *See Bruce Constr. Corp. v. United States,* 163 Ct.Cl. 97, 324 F.2d 516 (1963).

**2.** At argument plaintiff's counsel asserted for the first time that the 150 pound estimate noted in the contract specifications was not an actual estimate, but simply a number created for bid comparison purposes. Plaintiff did not point to

nor can the court find any basis for this contention in the record. Indeed, as government counsel noted, the government may not simply guess with respect to a contract specification, as the government will be held accountable for a negligent or faulty estimate. *See Medart, Inc. v. Austin,* 967 F.2d 579, 581 (Fed.Cir.1992) (stating that "the government must act in good faith and use reasonable care in computing its estimated needs; it is not free to carelessly guess at its needs").

8 and 9. This exceeds the bid quantity by a factor of 40. While your price of $10.00/lb may have been reflective of the cost to clean the tanks and dispose of the 150 lbs of sludge indicted in the bid schedule, the Government is convinced that your costs per pound will substantially decrease when disposing of the quantity collected. The Government is also convinced that the overall cost of disposing of the 10 inches of fuel impacted water, product and sludge and cleaning of the tanks will exceed the $2,400.00 allotted in the bid. *Therefore, the criteria for establishment of a [Differing Site Condition] is met. As such, please provide a proposal to dispose of the material encountered in Tanks 8 and 9. The proposal shall reflect the reasonable cost for removal and disposal of sludge, product and wastewater existing in the tanks, and cleaning of the tanks. The proposal shall be adequately broken down to enable an analysis of labor, material, equipment, overhead and profit in conformance with Clause 1.69, Modification Proposals—Price Breakdown (see enclosure).* Your proposal is required by August 28, 1995. Please note that the Government may consider a partial Termination for Convenience if this situation cannot be resolved reasonably.

(emphasis added).

Plaintiff did not submit a modified cost proposal, but instead sent a letter to defendant on August 18, 1995, stating that "the criteria for establishment of a [differing site condition] has not been met according to this contract." Plaintiff then expressly asserted a right to the unit price under the VEQ—Subdivided Items clause. The letter stated:

Our letter stated it was [Earth Burner's] "opinion" that differing site conditions may exist but the Government did not agree with our position because if the Government had agreed, the Government had the duty to test and sample. The contract is mandatory, the Government "shall" test and sample, so if the Government elects to not test and sample, a differing site condition cannot conceptually exist. In fact, the optional sampling and testing item in specification article 2NN, 8.3, can no longer

apply at all because the tanks are gone, their contents removed and either stored (sludge) or disposed of (contaminated water). In fact, we agree with your sentence, "Items 17AA and 17AB total 150 lbs. of sludge." It is our opinion that EFARS 12.402(100) and its application to AA and AB items provides, "Variations from the estimated quantity in the actual work performed under any second or subsequent sub-item or elimination of all work under such a second or subsequent sub-item will not be the basis for an adjustment in the contract unit price." In fact, the only adjustment allowed under this clause is for contract time completion.

In response to plaintiff's August 18, 1995 letter, defendant reiterated its view that payment would be governed by the Differing Site Condition clause explaining that, "the existence of a differing site condition, as defined in the contract, in Tank 9 was obvious upon discussions with you and observations by our field representative. As such, testing and sampling was determined not to be necessary to make this determination." Defendant concluded his letter by giving the plaintiff until September 30, 1995, to submit an adjusted cost proposal. This was followed by another contract modification, which further extended the suspension of work on Tanks 8 and 9.

When plaintiff failed to submit a proposed cost adjustment, defendant, on November 13, 1995, issued a Notice of Partial Termination for the Convenience of the Government with respect to all remaining work associated with the removal and disposal of sludge, product, and wastewater found in Tanks 8 and 9. The notice specifically asked for a cost breakdown as required by FAR 52.249. The letter stated "[s]ettlement proposals must cover all cost elements including settlements with subcontractors and any proposed profit. The proposal shall be in reasonable detail supported by adequate accounting data." Shortly after the termination, defendant contracted with OSI Environmental, Inc. ("OSI") to dispose of the contents of Tanks 8 and 9. OSI's invoice indicates that it disposed of 990 gallons of liquid, 45 gallons of contaminated water, and 2,280 lbs. of debris/solids. Defen-

dant paid OSI $3,230.50 for the disposal work.

In response to the termination notice, plaintiff made an offer to resolve the parties' differences on December 22, 1995. The letter stated:

> I have instructed my attorneys and accountants to temporarily cease work [on a termination settlement proposal] while I make a good faith thirty (30) day offer to settle this matter before proceeding to the next stage.... At this time, EBI is willing to accept compensation at the bid item rates for the 1,555 gallons of sludge material that was containerized on-site. Water/fuel disposal and tank cleaning would be considered as incidental items.... Total $81,750.

On February 28, 1996, defendant proposed a counteroffer. The counteroffer stated that the defendant was willing to pay plaintiff $9,686.00. Included in that offer was over $6,000.00 for removing and containerizing the materials from both tanks and $1,898.00 for Tank 9 water treatment. The record states and it is not disputed that the $1,898.00 payment had been previously agreed to as the price for treatment of the water in Tank 9.

When defendant did not receive a response to the counteroffer, defendant again wrote plaintiff, asking for a formal termination settlement proposal as required by the FAR 52.249. Defendant asked specifically for "an accounting or reasonable estimate of costs incurred in the actual performance of work associated with terminated bid items 17AA and 17AB" regarding Tanks 8 and 9.

On July 3, 1996, plaintiff submitted a claim for $335,500.00 to defendant for items 17AA and 17AB of the contract. The claim was not certified and did not include a breakdown of costs. Instead, plaintiff simply stated, "[i]n order to resolve this dispute pursuant to the terms of the contract, [Earth Burners] is entitled to compensation in the amount of $335,500.00 for items 17AA and 17AB that totals 4,780 gallons or 33,460 pounds of tank contents." On September 13, 1996, defendant notified plaintiff that the claim required a formal certification and reminded plaintiff to submit a breakdown of costs. On September 23, 1996, plaintiff certified the claim but did not submit a cost breakdown.

The Contracting Officer denied plaintiff's claim on January 17, 1997, and awarded plaintiff $6,251.41. The total was based on the Contracting Officer's estimate of the reasonable costs for removing, treating, and disposing of the 3,306 gallons of material handled by the plaintiff.[3]

With respect to plaintiff's claim for payment at the unit price for disposing of 33,460 pounds of tank contents, the Contracting Officer concluded:

> [T]here are two fatal flaws to the Contractor's claim. The first flaw is that the Contractor never disposed of any sludge that was in the tank. The Contract was terminated for convenience and the Government disposed of the sludge that was in the tanks. The second fatal flaw is that the tanks contained only 2,280 pounds of sludge.[4] Therefore, even if the Contractor had disposed of all of the contents of both tanks, it would have only been entitled to a payment of $23,700. In fact, the Contrac-

---

**3.** The Contracting Officer's decision stated: "Based upon the analysis by Joel Rogers, Contracting Officer Representative, (Tab E–7), I conclude that a fair and reasonable cost for removing, treating and disposing of the 3,306 gallons of waste water is $1,898.00; that a fair and reasonable cost for cleaning tanks 8 and 9 is $491.00; that a fair and reasonable cost for filling the drums is $263.00; that a fair and reasonable cost for handling and labeling the drums is $168.00; that a fair and reasonable cost for testing the contents of the drums is $300.00; and that a fair and reasonable costs for 25 drums is $1,250.00 or a total direct cost of doing the work of $4,370. I find that the Contractor, in addition to its direct cost, is entitled to overhead at a rate of 27%,

profit at 10%, and bond at 2.4%. This equates to a total entitlement of $6,251.41."

**4.** The Contracting Officer further explained: "The tank contents, in addition to sludge, included wastewater and product. The Contractor included product and waste water in its total of 33,460 pounds. The Contractor disposed of most of the waste water, 3306 gallons, and the remainder of the tank contents was disposed of or recycled by OSI Environmental Inc. The remainder of the tank contents, as evidenced by OSI's invoice to the Government, consisted of 990 gallons of recyclable liquids, 45 gallons of contaminated water and only 2,280 pounds of sludge."

tor did not dispose of any sludge from the tanks and, as such, is not entitled to payment under line items 17AA and 17AB.

The Contractor is, however, entitled to be compensated for the work connected with line items 17AA and 17AB, under the provisions of Contract Clause I.59, TERMINATION FOR THE CONVENIENCE OF THE GOVERNMENT. I have determined that the Contractor is, in accordance with Contract Clause I.59, entitled to a payment of $6,251.41.

I also note that, while the Contractor may appeal my decision that it is not entitled to be paid under the Contract's unit price for removal and disposal of sludge it did not dispose of, it is not entitled to appeal my determination of the amount due under the TERMINATION FOR THE CONVENIENCE OF THE GOVERNMENT Contract Clause.[5]

Plaintiff filed its complaint in this court on January 5, 1998, seeking the unit price or $335,500.00 for the disposal of 26,448 pounds of "sludge."[6] On November 20, 1998, defendant moved for summary judgment. Plaintiff cross-moved for summary judgment on December 1, 1998. Thereafter, on February 17, 1999, the court asked for supplemental briefing on the question of whether, assuming arguendo that the plaintiff disposed of "sludge," the VEQ or Differing Site Condition Clause governed payment. Oral argument was heard on April 8, 1999.

## DISCUSSION

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Rules of the Court of Federal Claims ("RCFC") 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed.Cir.1987). When the parties

have filed cross-motions for summary judgment, the court must evaluate each motion on its own merits. See Thermocor, Inc. v. United States, 35 Fed.Cl. 480, 484 (1996) (citing Prineville Sawmill Co. v. United States, 859 F.2d 905, 911 (Fed.Cir.1988)). "The fact that both parties argue in favor of summary judgment and allege that there are no genuine issues of material fact does not relieve the court of its duty to decide whether summary judgment is appropriate." Id.

Plaintiff asks the court to grant summary judgment on the ground that under its contract with defendant, it is entitled to the unit price for the removal, treatment, and disposal of all material from Tanks 8 and 9. Plaintiff argues that, as a matter of law, the VEQ—Subdivided Items clause controls because defendant failed to invoke properly the Differing Site Conditions clause. More specifically, plaintiff argues that defendant, by failing to confirm a differing site condition through "sampling and testing," is bound to pay the unit price under the VEQ clause. Plaintiff argues that it is entitled to the unit price under the VEQ clause for all wastes disposed of before the contract was terminated for convenience. Plaintiff asserts that all of the waste material it removed, treated, and disposed of from Tanks 8 and 9 is properly characterized as "sludge."

In addition, plaintiff asserts that even if there was a differing site condition the unit price should still apply to the materials removed, treated, and disposed of prior to the plaintiff receiving formal notice of the government's decision to invoke the Differing Site Conditions clause. Finally, plaintiff argues that under the contract it is entitled to the unit price for the first two inches of material it removed, treated, and disposed of from the tanks.[7]

Defendant argues in response to all of plaintiff's assertions that plaintiff is not entitled to the unit price for any of its work in

---

**5.** The Contracting Officer's decision stated, "[d]espite several requests by the Government the Contractor has failed to submit a final termination proposal to the Government and did not request a time extension to do so. Under such circumstances, there is no right of appeal."

**6.** Plaintiff originally stated that 27,360 pounds of sludge was removed, but later agreed to use the government calculation of 26,448 pounds.

**7.** The above noted two arguments were raised for the first time at the summary judgment hearing.

connection with Tanks 8 and 9 because the plaintiff did not dispose of any "sludge." Defendant contends that plaintiff only disposed of "wastewater," and therefore the unit price for "sludge" disposal is not relevant. In addition, defendant argues that even if the entire contents of Tanks 8 and 9 is assumed to be "sludge," an equitable adjustment was still proper on the grounds that the unit price never applied with respect to the materials found in Tanks 8 and 9. Defendant contends that once differing site conditions were discovered in Tanks 8 and 9, the contract expressly provided that plaintiff would be entitled only to its actual costs based on an equitable adjustment.

The parties agreed at argument that the only issue appropriate for summary judgment is whether, assuming arguendo the material plaintiff removed, treated, and disposed of was "sludge," the unit price governs payment for the work plaintiff performed prior to the termination for convenience. Whether the waste materials were "sludge" or "wastewater" is a factual issue that is clearly in dispute. Nonetheless, that factual dispute is material only if the unit price applies under the VEQ—Subdivided Items clause. If defendant is correct, however, and the Differing Site Conditions clause was properly invoked with respect to the materials discovered in Tanks 8 and 9, then the VEQ clause never became operative and plaintiff is not entitled to the unit price for any of the material plaintiff removed, treated, and disposed of from Tanks 8 and 9.

For the reasons set forth below, the court concludes that the unit price does not apply with respect to any of the materials plaintiff removed, treated, and disposed of from Tanks 8 and 9 because the contract expressly provided that compensation for material removed, treated, and disposed of from Tanks 8 and 9 would be governed by the Differing Site Conditions clause if anything *other* than two inches was found. It is not disputed that something "other" than two inches was found at Tanks 8 and 9. In such circumstances, plaintiff's claim for payment based upon the unit price must fail.

## I. Applicability of the Differing Site Conditions Clause

By its terms, Paragraph 8.3, Section 2NN of the contract provided:

> For bidding purposes, the Contractor shall assume *2 inches* of non-hazardous diesel *product/sludge* is present at the bottom of each tank. Sampling and testing of Tanks 8 and 9 contents is optional and shall only be performed if ordered by the Contracting Officer. If, through sampling and testing, the tanks are found to contain other than *2 inches* of non-hazardous diesel *product/sludge,* compensation therefore shall be in accordance with SECTION I: DIFFERING SITE CONDITIONS.

There is no dispute that the contents of Tanks 8 and 9 differed from the amounts identified in Paragraph 8.3, Section 2NN. It is agreed that Tank 8 consisted of approximately 150 gallons of product/sludge, which was substantially less than the two inches indicated, and the contents of Tank 9 consisted of approximately ten inches of fuel impacted wastewater and product/sludge, which was substantially greater than the two inches indicated.

In such circumstances, the contract by its plain terms called for application of the Differing Site Conditions clause, and thus our inquiry should be over. "When the contract language is unambiguous, the court's inquiry is at an end and the plain language of the contract is controlling." *Goldsmith v. United States,* 42 Fed.Cl. 664, 668 (1999); *see Textron Defense Sys. v. Widnall,* 143 F.3d 1465, 1469 (Fed.Cir.1998).

As noted above, plaintiff argues that the plain language of the contract does not end our inquiry because: (1) the Differing Site Conditions clause was not properly invoked; (2) the Clause applies only after it was invoked; and (3) plaintiff is entitled to the unit price for the first two inches of material it removed, treated, and disposed of from the tanks. Plaintiff's arguments are all without merit for the reasons discussed below.

Plaintiff argues that defendant's failure to perform testing and sampling violates a mandatory duty established by the contract and the FAR to confirm a differing site

condition through "sampling and testing" and "an investigation." According to plaintiff, because the defendant never confirmed a differing site condition it is bound by the unit price.

Plaintiff's argument is not persuasive. Plaintiff's assumption that the government was legally required to perform sampling and testing to confirm the existence of an *obvious and undisputed* differing site condition is unfounded. Plaintiff itself identified the existence of a differing site condition in July 1995. Indeed, plaintiff conceded in its July 27, 1995 letter to defendant that "[i]t is our opinion that [the lesser contents in Tank 8 and greater contents in Tank 9] are differing site conditions based on the language in the contract."

Moreover, plaintiff acknowledged in that same letter that those conditions had been observed on-site by a government representative. Thereafter, the government confirmed plaintiff's opinion and explained that "because of the obvious difference between conditions indicated and those experienced, the [Contacting Officer Representative] determined that testing of the material encountered was not required to determine the existence of a differing site condition." Indeed, plaintiff's request for over $300,000 based on its handling of more than 4,000 gallons of material confirms that something "other than 2 inches" of material was found in Tanks 8 and 9.

Where, as here, the differing site condition is obvious and undisputed, there is no legal consequence associated with defendant's decision not to conduct sampling and testing. Contrary to plaintiff's contention, the FAR does not mandate that sampling and testing be performed in every case. Rather, the FAR, by its terms, requires merely an "investigation." Here, the uncontested on-site observations of defendant's representative satisfy the "investigation" required by the FAR. Plaintiff has not identified and we have not found any case authority to suggest that a specific "investigation" is required to confirm an otherwise uncontested differing site condition. In such circumstances, plaintiff's contention that defendant's failure to perform sampling and testing negates the intent of Paragraph 8.3, Section 2NN of the contract and mandates that application of the VEQ—Subdivided Items clause must fail.[8]

■ Once the Differing Site Conditions clause was invoked under Paragraph 8.3, Section 2NN of the contract, the plaintiff was required to submit its actual costs or an estimate of its costs or run the risk that the defendant would make its own determination. There simply is no support for plaintiff's contention that the parties intended that the VEQ—Subdivided Items clause would serve as the basis for payment if something other than 2 inches was found in Tanks 8 and 9.[9]

8. Moreover, if were to adopt plaintiff's reading of the contract, it would lead us to a result that runs clearly counter to the "spirit and purpose" of the contract, in contravention of established contract law principles. *See Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991). It is well settled that the purpose behind the Differing Site Conditions clause is to "take at least some of the gamble ... out of bidding.... [The contractor] will have no windfalls and no disasters." *Foster Constr. C. A. v. United States*, 193 Ct.Cl. 587, 613–14, 435 F.2d 883, 887 (1970). The undisputed record shows that the cost associated with removing, treating and disposing of the wastes from Tanks 8 and 9 was $9,481.91 ($3,230.50 to OSI and $6,251.41 to plaintiff). In fact, plaintiff's $300,000 claim exceeds the entire value of this $247,135.00 contract. It is this type of windfall that the Differing Site Conditions clause is designed to prevent. By referencing the Differing Site Conditions clause in Paragraph 8.3, Section 2NN, defendant expressly made application of the Differing Site Conditions clause a part of the bargain.

9. Plaintiff suggests that defendant is estopped from relying on the Differing Site Conditions clause because plaintiff informed defendant that it was proceeding under the contract's original terms. This argument is not supported. Estoppel against the government is extremely difficult to establish and requires that: (1) the government must know the true facts; (2) the government must intend that its conduct be acted on or must so act that the contractor asserting the estoppel has a right to believe it so intended; (3) the contractor must be ignorant of the true facts; and (4) the contractor must rely on the government's conduct to his injury. *See Westinghouse Elec. Corp. v. United States*, 41 Fed.Cl. 229, 241 (1998) (citing *JANA, Inc. v. United States*, 936 F.2d 1265, 1270 (Fed.Cir.1991)). Plaintiff has alleged no facts suggesting any action by the government on which it could have relied on for the proposition that the unit price would be the standard for payment.

■ Having concluded that the Differing Site Conditions clause controls payment under this contract, we also reject plaintiff's argument that the unit price applied to materials removed, treated, and disposed of prior to plaintiff receiving notice of the government's decision to invoke the Differing Site Conditions clause. As noted above, the contract language was plain. If the tanks contained other than two inches of non-hazardous diesel product/sludge, compensation was to be in accordance with the Differing Site Conditions clause. Once plaintiff, together with the defendant's representative, identified that there clearly was more than two inches of material in Tank 9, as well as less in Tank 8, plaintiff was on notice that the payment would be renegotiated. There is nothing in the contract that requires payment based on the unit price until formal notification by the government of a differing site condition. To the contrary, the contract made plain that if *anything* other than two inches was present the Differing Site Conditions clause *"shall"* apply. The Differing Site Conditions clause requires the *contractor* to provide notice. Once the contractor provides the requisite notice, the contractor is obligated to proceed diligently with performance pending resolution of the claim. *See Discount Co. v. United States.*, 213 Ct.Cl. 567, 573, 554 F.2d 435 (1977).

■ Similarly, plaintiff's contention that it is entitled to be paid the unit price on the first two inches of material is without any basis under the contract. Again, Paragraph 8.3, Section 2NN expressly states that if anything *other* than two inches is found at Tanks 8 and 9 the unit price will no longer control. The contract does not retain a unit price for the first two inches of material removed, treated, or disposed of from the tanks.

For all of the above-stated reasons, we conclude that the Differing Site Conditions clause was properly invoked and that plaintiff's contentions regarding its right to pay-ment under the VEQ—Subdivided Items clause must fail.

## II. Termination for Convenience

■ There is no merit to plaintiff's claim that defendant's decision to terminate the contract was an improper effort to avoid paying the unit price under the VEQ—Subdivided Items clause. While the plaintiff is correct that the government may not retroactively terminate a contract for convenience in order to avoid making payments to the contractor, that is not what happened here.

■ For the reasons discussed above, defendant correctly determined that the plaintiff was entitled to its reasonable costs for the work it performed with regard to Tanks 8 and 9. In keeping with the contract, defendant repeatedly asked plaintiff to submit a cost proposal. Despite numerous requests plaintiff failed to do so. It was only after plaintiff refused to present a cost proposal that defendant terminated the contract for convenience.

Accordingly, this is not a case where the defendant terminated the contract in order to avoid payment. Rather, this is a case where the plaintiff, having unilaterally decided that it was entitled to the unit price, refused to provide the defendant with the information necessary to make an equitable adjustment.

## III. Termination Settlement Proposal

■ At oral argument plaintiff suggested that even if the unit price does not apply, the court is not foreclosed from awarding plaintiff more than the $6,251.41 equitable adjustment paid by the defendant. The defendant contended in response that while the court has jurisdiction to consider plaintiff's argument regarding the Contracting Officer's decision to reject plaintiff's claim for the unit price,[10] the court should not now consider any challenge to the $6,251.41 equitable adjustment because plaintiff waived its rights to challenge the amount when it failed to submit a formal "termination settlement proposal" under FAR 52.249.3.[11] *See Thermo-*

---

10. Because plaintiff submitted a certified claim in writing to the Contracting Officer regarding the application of the unit price, it is undisputed that we have jurisdiction to hear plaintiff's claim on the unit price. *See* 41 U.S.C. §§ 605(a), 605(c) (1994).

11. FAR 52.249.3 requires a contractor to submit specific information to support a cost claim.

cor, Inc. v. United States, 35 Fed.Cl. 480, 489 (1996) (after a case is properly in this court, a contractor may change the amount of its claim, but may not raise new claims or theories of recovery not presented to the Contracting Officer for a final decision); Santa Fe Eng'rs, Inc. v. United States, 818 F.2d 856, 858 (Fed.Cir.1987).

Plaintiff argued that it should not be held to the FAR requirements for submitting a breakdown of its costs because it did not have records that would have permitted it to provide an actual cost breakdown. Defendant countered by asserting that, assuming that plaintiff had no records, plaintiff would have been permitted to submit estimates of its costs. Indeed, the Contracting Officer expressly stated that he would accept "a reasonable estimate" in his February 28, 1996 letter to plaintiff asking for a "termination settlement proposal."

We agree with the defendant. Plaintiff based its entire claim on its belief that it was lawfully entitled to the unit price. We have rejected that unit price claim. The record is clear that the plaintiff never submitted a termination settlement proposal as required by the contract. In these circumstances, plaintiff may not be heard to question the $6,251.41 equitable adjustment award. See Do–Well Machine Shop, Inc. v. United States, 870 F.2d 637, 639 (Fed.Cir.1989); Thermocor, 35 Fed.Cl. at 493 (where recovery before the Contracting Officer was based on VEQ clause, new arguments for relief would not be heard).

## CONCLUSION

For the reasons stated above, plaintiff's motion for summary judgment is **DENIED** and judgment for the defendant is **GRANTED.** Each party to bear its own costs. The clerk is directed to enter judgment accordingly.