**Donald H. RUMSFELD, Secretary of Defense, Appellant,**

v.

**APPLIED COMPANIES, INC., Appellee.**

No. 01–1630.

United States Court of Appeals, Federal Circuit.

DECIDED: April 2, 2003.

Peter B. Jones, Jones & Donovan, of Newport Beach, CA, filed a combined petition for panel rehearing and rehearing en banc for the Appellee.

David B. Stinson, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, filed a response to the petition for the appellant. With him on the response were Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director; and Deborah A. Bynum, Assistant Director. Of counsel on the response was Donald Tracy, Trial Attorney, Defense Supply Center, Richmond, Defense Logistics Agency, of Richmond, Virginia.

Before SCHALL, DYK, and PROST, Circuit Judges.

Opinion for the Court filed by Circuit Judge SCHALL. Opinion concurring-in-part and dissenting-in-part filed by Circuit Judge DYK.

## ON PETITION FOR PANEL REHEARING.

### ORDER

Applied Companies, Inc. ("Applied") has petitioned for panel rehearing of the court's December 10, 2002 decision. *Rumsfeld v. Applied Companies, Inc.*, 318 F.3d 1317 (Fed.Cir.2002) ("*Applied*").

This suit arises out of a requirements contract between the Defense Logistics Agency ("DLA"), a component of the Department of Defense, and Applied. Under the contract, during the specified period, DLA was to purchase from Applied all of its requirements for two types of refrigerant storage cylinders. After DLA terminated the contract for the convenience of the government, Applied submitted termination settlement and breach of contract claims to the contracting officer. Among other things, Applied alleged that DLA

had breached the contract by providing, in the request for proposals ("RFP") furnished to prospective bidders, faulty estimates of the number of cylinders it would require during the contract period and then failing to inform bidders when it determined the estimates were inaccurate. Following the contracting officer's denial of its claim for lost profits, Applied appealed to the Armed Services Board of Contract Appeals ("Board") under the provisions of the Contract Disputes Act, 41 U.S.C. §§ 601–613. *Id.* at 1319.

Ruling on cross-motions for summary judgment, the Board concluded that DLA had breached the contract by negligently failing to inform Applied that the estimates in the RFP were inaccurate. *In re Applied Cos., Inc.,* ASBCA Nos. 50,749, 50,-896, and 51,662, 01–1 B.C.A. (CCH) ¶ 31,-325, at 154,729, 2001 WL 210655 (Feb. 26, 2001). The Board also concluded that, during quantum proceedings, Applied could seek to recover the profits it had anticipated making on the total number of cylinders that DLA estimated in the RFP. *Id.* at 154,734. The Secretary of Defense ("government") appealed the Board's decision. In our December 10 decision, we affirmed the Board's ruling that DLA had breached its contract with Applied. *Applied,* 318 F.3d at 1323. However, we also stated that, as a matter of law, Applied was not entitled to recover its anticipated profits. *Id.* at 1324.

In its petition for rehearing, Applied argues first that our decision contains a factual error. Specifically, Applied asserts that we incorrectly state that DLA purchased a total of approximately 11,500 cylinders under the contract. According to Applied, while DLA did order that number of cylinders, the contract was terminated before any deliveries were made. Applied's second point is that our conclusion that Applied is not entitled to recover its anticipated profits is incorrect as a matter

of law. In its response to the petition, the government states that "[t]he record below does not reflect—either way—whether, in fact, Applied delivered any items pursuant to the contract." As far as Applied's second point is concerned, the government urges that our decision is free of legal error.

Having considered Applied's petition and the government's response, we conclude that, to the extent our decision states in definitive terms that there were deliveries under the contract, the decision is factually incorrect. Accordingly,

IT IS ORDERED THAT:

(1) The Petition for Rehearing is granted for the limited purpose of correcting factual misstatements in the court's decision issued on December 10, 2002. That decision is hereby withdrawn and the decision attached to this Order is substituted in its place.

(2) In all other respects, the Petition for Rehearing is denied.

## OPINION

SCHALL, Circuit Judge.

This suit arises from a requirements contract between the Defense Logistics Agency ("DLA"), a component of the Department of Defense, and Applied Companies, Inc. ("Applied"). Under the contract, among other things, DLA was to purchase from Applied all of its requirements for two types of refrigerant storage cylinders during the period from June of 1994 through June of 1995, with an option year. In its request for proposals ("RFP"), DLA estimated its annual requirements for the two types of cylinders at 62,945 and 56,550 units, respectively. Prior to contract award, DLA determined that the estimates in the RFP were greatly overstated. However, this information was not communicated to any of the offerors, including

Applied. Applied was awarded the contract, but after ordering only approximately 10% of the estimated quantity of cylinders, DLA terminated the contract for convenience on February 6, 1995.

Following the denial of its termination for convenience settlement proposal and a claim for breach of contract, Applied appealed to the Armed Services Board of Contract Appeals ("Board") under the provisions of the Contract Disputes Act, 41 U.S.C. §§ 601–613 ("CDA"). Ruling on cross-motions for summary judgment, the Board concluded that DLA had breached the requirements contract by negligently failing to inform Applied that the estimates of its cylinder requirements in the RFP were inaccurate. Determination of the amount of damages was reserved for further proceedings. *In re Applied Cos., Inc.,* ASBCA Nos. 50,749, 50,896, and 51,-662, 01–1 B.C.A. (CCH) ¶ 31,325, 2001 WL 210655 (Feb. 26, 2001) *("Applied I").* DLA's subsequent motion for reconsideration was denied. *In re Applied Cos., Inc.,* ASBCA Nos. 50,749, 50,896, and 51,662, 01–2 B.C.A. (CCH) ¶ 31,430, 2001 WL 583462 (May 21, 2001) *("Applied II").* The Secretary of Defense ("government") now appeals the Board's decision. Because the Board did not err in holding that DLA had breached its contract with Applied, we affirm.

## BACKGROUND

### I.

The pertinent facts, which are not in dispute, are set forth in *Applied I.* They are as follows:

The requirements contract stemmed from a procurement for cylinders to store R–12 and R–114 refrigerants, which are classified as "Class I Ozone Depleting Substances," or "ODSs." *Applied I,* 01–1 B.C.A. at 154,730. DLA, which was charged with building and maintaining a stockpile of ODSs for the Department of Defense, assessed the existing inventories of ODSs, the amount of ODSs likely to be used and recycled, and the amount of ODSs needed to ensure availability for mission critical uses. In June of 1993, based on its assessment, DLA developed estimates of the amount of R–12 and R–114 refrigerants that it needed to acquire and, by extension, the number of cylinders that would be required to store those refrigerants. *Id.* On July 14, 1993, DLA issued the RFP for the requirements contract. DLA estimated in the RFP that 62,945 cylinders would be needed for the storage of R–12 refrigerants and that 56,-550 cylinders would be needed for the storage of R–114 refrigerants, for a total of approximately 120,000 cylinders during the one year term of the contract.[1] *Id.* The RFP stated that the variation in actual quantity purchased would be "plus 03% minus 03%." The estimated quantities were the same for the option year. *Id.* On or about August 11, 1993, Applied, among others, responded to the RFP. Applied was the lowest responsive offeror.

In January of 1994, after initiating a pre-award survey, DLA determined that the reserve requirements for R–12 and R–114 refrigerants were considerably lower than previously believed. *Id.* at 154,731. As a result, DLA established that the number of R–12 and R–114 storage cylinders that would be needed during the upcoming year were 2,555 and 1,037, respectively. *Id.*

On June 20, 1994, DLA awarded the requirements contract to Applied, accepting its bid of $52.60 per cylinder. *Id.* In

---

1. The RFP and contract involved other sizes and models of cylinders that are not at issue in this dispute. In the interest of clarity, we hereafter refer to the two types of cylinders at issue as the "cylinders" covered by the contract.

the notice of award, DLA repeated the estimates contained in the RFP. Under the contract, for the period June 20, 1994, to June 14, 1995, DLA was obligated to "order from the contractor all the [cylinders] that are required to be purchased by the Government." The contract also provided that the "quantities of [cylinders] specified in the schedule are estimates only and are not purchased by this contract." The contract incorporated various clauses from the Federal Acquisition Regulations ("FAR").

In August of 1994, DLA informed Applied—for the first time—that it had "discovered that a significant mistake was made in calculating the estimates." *Id.* In place of the erroneous estimates contained in both the RFP and the contract, DLA provided new estimates of the minimum and maximum quantities of R–12 and R–114 refrigerant cylinders actually purchased that it would require. *Id.* DLA eventually ordered a total of approximately 11,950 units of R–12 and R–114 cylinders, approximately one-tenth of the total quantity originally estimated. *Id.*

DLA sought to modify the contract to reflect the new estimates. Applied responded by submitting a revised price of $126.98 per cylinder and requesting payment for $615,945 in "under absorbed indirect costs." *Id.* DLA replied by proposing to pay $79 per unit for the reduced quantity of cylinders. Applied did not accept this proposal, and on February 6, 1995, DLA terminated the contract for convenience. *Id.* at 154,732. It does not appear from the record before us that Applied delivered any cylinders to DLA.

Applied submitted a termination for convenience settlement proposal in the amount of $1,791,499.00, to compensate it for the shortfall in the cylinders ordered by DLA and for the overhead it allegedly absorbed in the course of preparing for and performing its obligations under the contract. *Id.* On February 26, 1997, by unilateral determination, the termination contracting officer denied payment for under-absorbed overhead costs and unilaterally settled Applied's termination claim for $295,253.00. *Id.* This sum covered Applied's costs of terminating its work in progress and $31,718.00 for profit relating to work in progress. Since Applied already had received partial payments under the contract totaling $295,253.00, the termination contracting officer determined that Applied was not entitled to any payment by way of termination settlement. *Id.*

Applied subsequently submitted to the contracting officer a claim for breach of contract. Applied alleged that it had relied on DLA's faulty estimates in preparing and submitting its bid and had entered into agreements with subcontractors and suppliers accordingly. *Id.* at 154,733. Based on the estimates contained in the RFP and contract, Applied asserted, it had expected to generate a profit of $8.85 per cylinder on approximately 119,495 cylinders, for a total profit of $1,057,530.80. *Id.* According to Applied, DLA's negligence in the preparation of the estimates constituted a breach of contract that entitled Applied "to recover damages in the amount of its anticipated profit."

On June 12, 1998, the contracting officer issued a final decision denying Applied's breach claim. *Id.* Though the contracting officer concluded that DLA had failed to exercise due care in the preparation of its estimates, she viewed that negligence as giving rise to a constructive change, rather than a breach, of the contract between DLA and Applied. Accordingly, she ruled that, in terms of relief, Applied was limited to an equitable adjustment under the Changes Clause of the contract, *see* FAR 52.243–1(b), 48 C.F.R. § 52.243–1(b), or to the recovery of the costs it had incurred plus a reasonable profit, as contemplated by the Termination for Convenience

Clause, *see* FAR 52.249–2(f)(2), 48 C.F.R. § 52.249–2(f). The contracting officer stated that whatever costs Applied could have established under a theory of constructive change or partial termination for convenience would have been paid as part of the termination settlement.

## II.

Applied appealed the two contracting officers' decisions to the Board. Ruling on the parties' cross-motions for summary judgment, the Board addressed the question of whether DLA's negligent inclusion of inaccurate estimates in the RFP was a breach of its requirements contract with Applied. Noting the undisputed fact that "the Government knew it would actually need about one-tenth of the quantities in the solicitation," and relying on the decision of the Court of Claims in *Womack v. United States*, 182 Ct.Cl. 399, 389 F.2d 793 (1968), the Board ruled that DLA's actions

---

**2.** The Board denied Applied's claim for anticipatory profits for the option year that DLA did not exercise. The Board also denied the government's motion for summary judgment dismissing Applied's appeal of DLA's unilateral determination of the termination for convenience settlement. *Applied I*, 01–1 B.C.A. at 154,734. Since the termination settlement claim and the breach of contract claim sought the same anticipatory profits, the Board sustained both appeals "with the understanding that one of the appeals will be dismissed during the quantum phase after an agreement is reached or a determination is made as to the date when interest begins." *Id.* at 154,735.

**3.** We have exclusive jurisdiction "of an appeal from a *final* decision of an agency board of contract appeals pursuant to section 8(g)(1) of the Contract Disputes Act of 1978." 28 U.S.C. § 1295(a)(10) (emphasis added). The CDA provides that all claims must first be submitted to the contracting officer for a decision. *See* 41 U.S.C. § 605(a); *Dewey Elecs. Corp. v. United States*, 803 F.2d 650, 654 (Fed.Cir.1986). After receiving an adverse decision from the contracting officer, the contractor may appeal that decision to the appropriate agency board of contract appeals. *See*

constituted a breach of the contract that entitled Applied to compensatory damages: "The Government was ... negligent, and appellant is entitled to ... damages for breach of the contract." *Applied I*, 01–1 B.C.A. at 154,734. The Board therefore granted Applied's motion for summary judgment. Finally, while it noted that its decision only addressed the issue of Applied's entitlement, the Board observed that "[b]reach damages may include anticipatory profits." *Id.* (citing *Carchia v. United States*, 202 Ct.Cl. 723, 485 F.2d 622, 625 (1973)).[2] On May 21, 2001, the Board denied the government's motion for reconsideration. *Applied II*, 01–2 B.C.A. ¶ 31,430. The government timely appealed the Board's decision. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10).[3]

## DISCUSSION

We review the Board's decision under the standard set forth in the CDA:

---

41 U.S.C. § 607; *Dewey*, 803 F.2d at 654. In view of the foregoing scheme, the breadth of issues covered in the contracting officer's decision "determines the extent of the contractor's right of appeal and the board's jurisdiction." *Id.* at 655. For example, in *Dewey*, we held that where the contracting officer decided only entitlement and the board thereafter decided entitlement and remanded to the parties regarding quantum, the board's decision was final and thus appealable. *Id.* at 658.

In this case, Applied appealed two contracting officers' decisions to the Board. *Applied I*, 01–1 B.C.A. at 154,733. In the first decision, the termination contracting officer denied Applied entitlement to under-absorbed overhead costs. In the second decision, the contracting officer denied Applied's claim for breach of contract. For its part, the Board only decided entitlement. *Id.* at 154,734. Accordingly, since the contracting officer did not decide quantum, but decided only entitlement, the Board's decision on entitlement is final and appealable to this court. *See Dewey*, 803 F.2d at 655 ("In rendering a decision as to entitlement ... the Board decided all of the issues then before it. ...").

The decision of the agency board on any question of law shall not be final or conclusive, but the decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.

41 U.S.C. § 609(b). Because the parties do not dispute the facts relating to the preparation of the estimates, inclusion of the estimates in the RFP, and the termination of the contract, the sole question before us is whether the Board's decision is tainted by legal error. We review the Board's legal conclusions *de novo*. *Rex Sys. v. Cohen*, 224 F.3d 1367, 1371 (Fed. Cir.2000); *Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1446 (Fed.Cir.1997).

On appeal, the government does not dispute that DLA's estimates as to the number of R–12 and R–114 refrigerant cylinders that it would require during the contract term were significantly overstated. Neither does the government dispute that, prior to contract award, DLA was aware that the estimates were incorrect but did not inform Applied of the error until after the contract was awarded. The government asserts, however, that the Board erred as a matter of law (i) in holding that DLA breached its contract with Applied and (ii) in stating that, as far as damages are concerned, Applied is entitled to recover anticipatory profits. We address these contentions in turn.

## I.

The government argues that a requirements contract only obligates an agency to purchase from a contractor all its requirements for the items covered by the contract, at the agreed-upon price; it does not obligate the agency to purchase a particular quantity of items. Starting from that premise, the government contends that

DLA did not promise to purchase the estimated quantity of approximately 120,000 cylinders and that, consequently, its failure to do so did not breach the contract. In short, under the government's reasoning, the fact that DLA awarded the contract to Applied knowing the estimates in the RFP were faulty is irrelevant for purposes of determining whether there was a breach of contract. Applied responds that it is the law of this circuit that, by preparing estimates negligently, the government may breach a requirements contract even if it in fact fulfills such needs as it has for contract items from the contractor. The government's understanding as to the nature of a requirements contract is correct, but we agree with Applied that faulty estimates may form the basis for a claim that a requirements contract has been breached.

A requirements contract "calls for the government to fill all its actual requirements for specified supplies or services during the contract period by purchasing from the awardee, who agrees to provide them at the agreed price." *Medart, Inc. v. Austin*, 967 F.2d 579, 581 (Fed.Cir.1992). This arrangement offers the government a measure of both flexibility and cost certainty, by ensuring the government an adequate supply of the required item at an agreed price before it determines the exact quantity of items it ultimately will purchase. *Id.* In exchange for providing the government cost certainty and flexibility with respect to the quantity of items ordered, a contractor, at least in theory, may exact a higher per unit price. *Technical Assistance Int'l v. United States*, 150 F.3d 1369, 1372 (Fed.Cir.1998).

While the quantity of items that the government will purchase under a requirements contract necessarily is uncertain, it is not irrelevant, as the quantity may impact both a contractor's capacity to

supply the contract items and the price at which it agrees to supply them. *Medart,* 967 F.2d at 581. For that reason, as part of the solicitation for a requirements contract, the government prepares estimates of the quantity of goods it will require during the term of the contract. These estimates, though "not guarantees or warranties of quantity," *Shader Contractors, Inc. v. United States,* 149 Ct.Cl. 535, 276 F.2d 1, 7 (1960), constitute one of the only limitations on the government's otherwise almost unbridled flexibility with respect to the number of units it purchases. Therefore, there is an implied obligation upon the government to "act in good faith and use reasonable care in computing its estimated needs." *Medart,* 967 F.2d at 581. Failure to meet that obligation constitutes a breach of the resulting contract. *Id.* We have stated that, "[w]here a contractor can show by preponderant evidence that estimates were 'inadequately or negligently prepared, not in good faith, or grossly or unreasonably inadequate at the time the estimate was made[,]' the government could be liable for appropriate damages resulting." *Id.* (quoting *Clearwater Forest Indus., Inc. v. United States,* 227 Ct.Cl. 386, 650 F.2d 233, 240 (1981)). Accordingly, to the extent that a government estimate is inadequately or negligently prepared, its inclusion without correction in a solicitation or contract constitutes a misrepresentation that, whether deliberate or unintentional, amounts to a breach of contract. *Womack,* 389 F.2d at 800.

■ This case is squarely controlled by the jurisprudence that holds that negligently prepared estimates can give rise to a claim for breach of a requirements contract:

> It is not disputed that the Government knew it would actually need about one-tenth of the quantities in the solicitation. It did not exercise reasonable care when that knowledge, acquired well in advance of contract award, was not factored into the contract estimates. The Government was, therefore, negligent, and appellant is entitled to ... damages for breach of the contract.

*Applied I,* 01–1 B.C.A. at 154,734. In view of the undisputed facts, the Board did not err in holding that DLA breached the requirements contract and that Applied was entitled to recover the damages that resulted from the breach.[4]

## II.

As noted above, the Board only decided the issue of liability. It did not address quantum. The Board did, however, make statements concerning the recovery to which it believed Applied was entitled by reason of DLA's breach. In *Applied I,* the Board stated that Applied was entitled to "compensatory damages" for DLA's breach, and it observed that "[b]reach damages may include anticipatory profits." *Id.* at 154,734. In *Applied II,* the Board stated that because DLA's breach was "total," Applied "is entitled to be made whole, and here that includes anticipatory profits to the extent they can be proved." 02–1 B.C.A. at 155,220. The Board's statements regarding quantum suggest that it is appropriate for us to provide guidance regarding the proper measure of Applied's recovery. *See Fla. E. Coast Ry. Co. v. United States,* 228 Ct.Cl. 647, 660 F.2d

---

4. As noted, the Board found that DLA's estimates were negligently prepared. The Board did not find bad faith on the part of DLA. A finding of bad faith is not a prerequisite to a claim for breach of contract based upon faulty estimates. As the Court of Claims explained in *Womack,* "[a]n inadvertent misrepresentation stemming from negligence is fully as damaging as a deliberate one to the party who relies on it to his detriment." 389 F.2d at 800.

474, 475 (1981) (Though the trial judge had ruled only on the issue of liability and the determination of quantum was reserved for further proceedings, the court addressed quantum because it thought it "appropriate ... to comment ... for the further guidance of the parties and the trial judge, and to underscore [its] judgment as to a controverted important issue central to the case.").

The parties' respective positions on the damages issue are as follows: The government argues that when, under a requirements contract, an agency orders all the contract items it requires from a contractor, the contractor may not recover anticipatory profits to compensate it for the loss of sales that never occurred and to which it never was entitled under the contract. According to the government, a contractor's recovery for negligently prepared estimates is limited to reliance damages and a price adjustment. Applied submits that it is entitled to a recovery of compensatory damages that includes anticipatory profits. Applied contends that the proper measure of damages to compensate for DLA's breach is the profit it would have made on the entire quantity of cylinders that DLA negligently estimated it would require. For the reasons set forth below, we agree with the government that Applied is not entitled to anticipatory profits on the estimated quantity of cylinders.

■ As a general rule, when there has been a breach of contract, the non-breaching party is entitled to an award of damages that will place it "in as good a position as [it] would have been in had the breaching party fully performed." *Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012, 1021 (Fed.Cir.1996). This rule sets the floor for damages, by ensuring that the non-breaching party suffers no pecuniary loss as a result of the breach. It sets the ceiling for damages as well, because the non-breaching party is "not entitled to be put in a better position by the recovery than if the [breaching party] had fully performed the contract." *Miller v. Robertson*, 266 U.S. 243, 260, 45 S.Ct. 73, 69 L.Ed. 265 (1924). Put another way, "the non-breaching party 'should on no account get more than would have accrued if the contract had been performed.'" *White v. Delta Constr. Int'l, Inc.*, 285 F.3d 1040, 1043 (Fed.Cir.2002) (quoting *DPJ Co. v. FDIC*, 30 F.3d 247, 250 (1st Cir. 1994)). In order to recover anticipatory profits for the government's breach of a contract, the non-breaching party "must establish by a preponderance of the evidence" the requirements for such an award. *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1324–25 (Fed.Cir. 2002). "Lost profits are 'a recognized measure of damages where their loss is the proximate result of the breach and the fact that there would have been a profit is definitely established, and there is some basis on which a reasonable estimate of the amount of the profit can be made.'" *Cal. Fed. Bank v. United States*, 245 F.3d 1342, 1349 (Fed.Cir.2001) (quoting *Neely v. United States*, 152 Ct.Cl. 137, 285 F.2d 438, 443 (1961)).

Because the purpose of a damages award is to put the non-breaching party "in as good a position as [it] would have been in had the breaching party fully performed," *Wells Fargo Bank*, 88 F.3d at 1021, the logical starting point for a damages analysis is an understanding of the breaching party's obligations under the contract. As explained above, a requirements contract "calls for the government to fill all its actual requirements for specified supplies or services during the contract period by purchasing from the awardee, who agrees to provide them at the agreed price." *Medart*, 967 F.2d at 581. Court of Claims and Federal Circuit cases that support the award of anticipatory profits for the breach of a requirements

contract all involve situations in which the government failed to perform this obligation because it had "actual requirements for specified supplies and services" but, in one way or another, diverted that business away from the party with whom it had contracted.

In *Locke v. United States,* 151 Ct.Cl. 262, 283 F.2d 521 (1960), the government contracted to list the plaintiff's typewriter repair company, along with three other companies, in a Federal Supply Schedule. *Id.* at 522. Various departments of the federal government were required to use the contractors whose names appeared on the schedule. In exchange for the government's listing of his company in the schedule, Locke's company "was obligated to perform all the services for which he contracted." *Id.* at 523. After several months of listing Locke's company, during which time the company received business from the government, the government terminated the contract and struck the company from the schedule. Locke sued for breach of contract, seeking damages in the form of lost profits. After the Board of Review of the General Services Administration denied him relief, Locke filed suit in the Court of Claims.

In opposing Locke's breach claim, the government advanced essentially two arguments. First, it contended that since Locke's company had entered into a requirements contract, which did not guarantee that any minimum quantity of services would be ordered, Locke could not recover lost profits for providing services to which his company had no entitlement under the contract. Second, the government urged, it only agreed to list Locke's company, along with other typewriter-repair contractors. Because departments were free to choose any of the listed companies to perform the services at issue, the government's performance of the contract by continuing to list Locke's company did not

guarantee the company any actual sales. The government contended that, under these circumstances, any award of lost profits was speculative and inappropriate. *Id.* The Court of Claims rejected the government's contentions. As for the first argument, the court stated:

> We agree that nothing in the contract would have prevented the Government from enlarging its own repair facilities to fill completely its needs. This would have left nothing to be awarded under the Federal Supply Schedule contracts. But the facts as alleged show that the Government did have some service requirements beyond its own capacity. Presumably, these requirements were awarded to contractors in the schedule. Plaintiff's chance of obtaining some of these awards, by being in the schedule and competing with the other contractors, had *value* in a business sense. The Government by its breach deprived plaintiff of this value.

*Id.* at 524 (emphasis in original).

In rejecting the government's second argument—that an award of anticipatory profits would be speculative—the court pointed out that it appeared that Locke "did have a chance of obtaining at least one-fourth of the total typewriter repair business let by the Government." *Id.* at 525. The court therefore referred the case to the trial commissioner for further proceedings, directing the trial commissioner to determine: (1) the total amount of typewriter-repair business that was let by the government and for which Locke would have been eligible but for the government's breach; (2) whether any material facts would have tended to prevent Locke from receiving its proportionate share of the business that was available; (3) the average unit cost normally incurred in performing the kind of repair work involved under the contract; and (4) the expenses

that Locke would have incurred in performing its obligations under the contract. *Id.* Thus, in *Locke,* the Court of Claims held that the contractor was entitled to recovery to the extent of (i) the amount of typewriter-repair business that existed that it would have obtained; and (ii) its ability to satisfy the requirements for the recovery of lost profits stated in *California Federal Bank.*

In *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756 (1982), the government entered into a requirements contract with Soledad Enterprises, Inc. ("Soledad") for grounds maintenance and refuse removal at six Navy family housing projects. However, upon recognizing that it could procure the contract services from the Department of the Navy's Public Works, the government diverted its rodent pest control services away from Soledad, in breach of the requirements contract. *Id.* at 758. The Court of Claims rejected the government's argument that because Soledad did not perform any pest control services under the requirements contract, the contract had been constructively terminated for the convenience of the government. The court stated that the termination for convenience clause does not allow the government to divert business away from a contractor and breach its only meaningful obligation under a requirements contract. *Id.* at 771. Significantly, though the court left the question of damages for further proceedings, it made clear Soledad's entitlement was not to an "obligatory minimum" number of calls for pest control work, but to "all of the buyer's requirements." *Id.* at 761.

Finally, in *Ace–Federal Reporters, Inc. v. Barram,* 226 F.3d 1329 (Fed.Cir.2000), we reaffirmed the availability of lost profits compensation when the government breaches a requirements contract by procuring goods or services from third party sources. In that case, the plaintiffs entered into requirements contracts with the General Services Administration ("GSA") for transcription and court reporting services for various federal agencies. Each contract included the standard requirements clause found in FAR § 52.216–21(c). That clause states that, "[e]xcept as this contract otherwise provides, the Government shall order from the Contractor all the supplies or services specified in the Schedule that are required to be purchased by the Government activity or activities specified in the Schedule." 48 C.F.R. § 52.216–21(c). However, none of the plaintiffs was assured that any of the agencies would purchase its services. The government's sole obligation under the several contracts was to purchase from the pool comprised of the contracting plaintiffs all the transcription requirements of the listed agencies. It was stipulated that, during the period of the contracts, some of the agencies covered by the contracts contracted for transcription services with companies that were not parties to the GSA contracts. *Ace–Federal Reporters,* 226 F.3d at 1331. This was not permitted absent a waiver from GSA. *Id.* The plaintiffs filed claims with GSA's contracting officer, alleging that the off-schedule purchases by some agencies constituted a breach of contract. For the alleged breach, they sought to recover lost profits and consequential damages. After the contracting officer denied the claim and the GSA Board of Contract Appeals sustained the denial, the plaintiffs appealed to this court. Because we concluded that the Board had erred in holding that the terms of the contracts precluded recovery of lost profits damages, we reversed and remanded.

Recognizing that the contracts at issue were not typical requirement contracts and that they did not guarantee any of the individual contractors business, because the agencies were free to choose amongst

the contractors for the provision of transcription services, we analogized to *Locke*. In both cases, the government asserted that the absence of any guarantee of obtaining work rendered lost profits too speculative to prove. Like the Court of Claims in *Locke*, we disagreed, holding that the government's promise to purchase transcription services only from the contractors on the schedule "ha[d] substantial business value because there were only between two and five authorized sources" for the services in each geographical region. *Id.* at 1332. We concluded that, under these circumstances, by considering the total amount of transcription services the government purchased from third parties, along with other relevant factors, the court or the Board reasonably could determine the amount of actual business and profits that the plaintiffs lost as a result of the breach. *Id.* In other words, because the government's breach in *Ace–Federal* involved the diversion away from the non-breaching parties of actual business that they otherwise would have received (as in *Torncello* and *Locke*), the loss of profits was a "proximate result of the breach and . . . there [was] some basis on which a reasonable estimate of the amount of the profit [could] be made." *Cal. Fed. Bank*, 245 F.3d at 1349.

■ The combined teaching of *Locke*, *Torncello*, and *Ace–Federal* is that the government breaches a requirements contract when it has requirements for contract items or services, but diverts business from the contractor and does not use the contractor to satisfy those requirements. In that case, the contractor is entitled to recover damages in the form of lost profits, provided it is able to meet the requirements for lost profits recovery noted in *California Federal Bank*. The critical point is that the government's breach of its obligation "to fill all its actual requirements . . . by purchasing from the awardee," *Medart*, 967 F.2d at 581, has the effect of taking away from the contractor the opportunity to earn a profit.

■ This case, however, does not involve the kind of breach that occurred in *Locke*, *Torncello*, and *Ace–Federal*. DLA did not purchase from third parties the refrigerant cylinders that it was obligated, under the contract, to purchase from Applied. Thus, unlike the government in those cases, it did not divert from a requirements contractor business that existed. To the contrary, it did order from Applied all of its actual requirements for refrigerant cylinders, although those requirements were far less than what had been estimated in the RFP. Eventually, the contract was terminated for the convenience of the government after Applied and DLA were unable to agree on an adjusted price for the cylinders. In short, the government did not commit the breach that occurred in *Locke*, *Torncello*, and *Ace–Federal;*—diverting business that existed away from the contractor.

The government's breach in this case was the inclusion of negligently prepared estimates in the RFP. For that breach, Applied is not entitled to recover the profits it would have made had DLA in fact had requirements to the extent of approximately 120,000 refrigerant cylinders. Allowing Applied to recover lost profits on the 120,000 estimated cylinders would effectively convert the contract at issue from one to satisfy all of DLA's requirements to one in which DLA guaranteed Applied a certain level of business. Contract estimates are "not guarantees or warranties of quantity," however. *Shader Contractors*, 276 F.2d at 7. No case has been cited to us in which, under a requirements contract, a contractor was allowed to recover anticipatory profits as damages for a breach of contract resulting from negligently prepared estimates.

In addition, in order to recover anticipatory profits, it must be "definitely established" that without the government's breach there would have been a profit. *Cal. Fed. Bank,* 245 F.3d at 1349. Applied cannot meet that requirement. Had DLA discharged its duty by properly preparing and propounding the cylinder estimates, or if it had told offerors that the estimates were inaccurate before contract award, Applied would not have expected to sell, and it would not have sold, 120,000 cylinders. In other words, the profit Applied attempts to recover in the form of lost profits for anticipated sales would not "definitely" have existed but for DLA's breach.

Finally, awarding Applied damages in the form of lost profits would allow Applied to profit from DLA's breach. If DLA had furnished a reasonable estimate of its cylinder needs for the term of the contract, one of two things would have occurred: either Applied would have submitted a bid and been awarded the contract, in which case it perhaps would have earned a profit on the number of cylinders it sold; or Applied would have declined to bid on the contract, in which case it would have earned no profit. To the extent that it is allowed to recover a profit based upon the 120,000 units of cylinders included in DLA's negligently prepared estimates, Applied would find itself in a better pecuniary position than if DLA had never propounded the inflated estimates and breached the contract. As noted above, such a damages award would squarely conflict with the rule that a non-breaching party "should on no account get more than would have accrued if the contract had been performed." *Delta Constr. Int'l,* 285 F.3d at 1043.

■ In our view, *Everett Plywood v. United States,* 190 Ct.Cl. 80, 419 F.2d 425 (1969), suggests the proper methodology for determining the recovery to which a contractor is entitled by reason of the kind of breach that occurred here. In that case, the plaintiff agreed to cut and purchase timber located in the Snoqualmie National Forest in the State of Washington. In its prospectus issued before award of the contract, the United States Forest Service estimated the total volume of timber in the specified area to be approximately 73,100 M board feet. *Id.* at 427. Though Everett Plywood's agreement to purchase the timber from the Forest Service was not a requirements contract, the estimates of volume were material to the contract. The estimates were inaccurate, as the total volume of timber that Everett Plywood was able to cut and purchase under the contract was 46,081 M board feet, or approximately 27,000 fewer M board feet than the Forest Service had estimated in the prospectus.

The Court of Claims calculated the damages resulting from the breach. The court pointed out that because of the Forest Service's inaccurate estimate, Everett Plywood cut less timber than it expected when bidding on the contract. Its per unit cutting costs therefore increased. Accordingly, Everett Plywood "suffered damages ... as a reasonably foreseeable result of defendant's breach of warranty, by failing to realize the advantages of the lower average rates which would have resulted" from cutting a larger volume of timber. *Id.* at 433. The court therefore calculated "the average rate which plaintiff would have paid ... had the contract volume ... been realized." *Id.* Then, to compute the damages to which Everett Plywood was entitled, the court applied the difference between that rate, which Everett Plywood would have paid had the government's estimates been accurate, and the contract rate, for the volume actually cut, "to arrive at the excess payment ... resulting from plaintiff's failure to realize the lower average rate contemplated." *Id.* In other words, Everett Plywood was entitled to

compensation for the loss it incurred as a result of the Forest Service's faulty estimate, in the form of an adjustment to the contract price applied to the volume of timber actually cut under the contract.

Similarly, in *Crown Laundry & Dry Cleaners, Inc. v. United States,* 29 Fed.Cl. 506 (1993), the court stated: "Where a contractor can show by preponderant evidence that estimates it relied on were negligently prepared or were unreasonably inadequate, indicating a lack of due care in their preparation at the time the estimates were made, the government may be liable for resulting damages." *Id.* at 520. The court further stated that, in such a situation, the contractor "is entitled to be paid the reasonable value of the work performed." *Id.* at 524. The court explained that paying the contractor the reasonable value of the work performed may involve increasing the contract price. This is because "[w]hen actual work performance produce[s] a lower number of items, the cost allocation per work item [is] higher than was the bid price[,] which was based on a higher number of work items and an attendant lower cost allocation per item of work." *Id. See also In re Cactus Press/Power Enters., Inc.,* GPOBCA 20–99 (Jan. 31, 2001) (recognizing "the well-settled principle relating to 'requirements contracts' which holds that contractors who submit bids in reliance on negligently prepared and incorrect estimates of work in the solicitation are entitled to an equitable adjustment" (citations omitted)); *In re HKH Capitol Hotel Corp.,* ASBCA No. 47,575, 98–1 B.C.A. (CCH) ¶ 29548, at 146,-472, 1998 WL 34784 (Jan. 26, 1998) ("Where the Government's estimate is negligently prepared and appellant reasonably relies upon that estimate to its financial detriment, the remedy is an equitable adjustment." (citation omitted)); John Cibinic, Jr. & Ralph C. Nash, Jr., *Formation of Government Contracts* 1205 (3d ed. 1998) (stating that relief for faulty government overestimates "has been measured by repricing the contract quantities based on an accurate estimate of the quantities of work. Such repricing places the contractor in the position it would have occupied but for the Government breach.").

It does not appear from the record before us that Applied delivered any cylinders before DLA terminated the contract for the convenience of the government. If any cylinders were delivered, Applied should have the opportunity to establish that it is entitled to an equitable adjustment in the price of those cylinders because it relied on DLA's negligent estimates and, as a result, suffered damages. We note that, in denying Applied's breach claim, DLA's contracting officer referenced such an approach. The contracting officer noted that "[a]n equitable adjustment compensates for changes by paying a contractor its increased costs resulting from the change, plus an allowance for profit on that cost." *See United States v. Callahan Walker Constr. Co.,* 317 U.S. 56, 61, 63 S.Ct. 113, 87 L.Ed. 49 (1942) ("An 'equitable adjustment' . . . involved merely the ascertainment of the cost of [additional work] . . . and the addition to that cost of a reasonable and customary allowance for profit."); *Earth Burners, Inc. v. United States,* 43 Fed.Cl. 481, 482 (1999) (noting that "[t]he proper measure of an equitable adjustment is reasonable costs, including reasonable profit for the work performed" (citation omitted)); *In re Gen. Ry. Signal Co.,* ENGBCA No. 6168, 96–1 B.C.A. (CCH) ¶ 27981, at 139,755, 1995 WL (Aug. 3, 1995) ("We conclude that the equitable adjustment for the switching machines should be measured by the contractor's reasonable cost plus an allowance for a fair and customary profit." (citation omitted)). We think the approach of an equitable adjustment properly assesses Applied's

damages.[5]

If, as appears to be the case, no cylinders were delivered, Applied is limited to recourse under the Termination for Convenience of the Government Clause of the contract. As noted above, Applied's termination settlement claim and breach of contract claim sought the same anticipatory profits. As we have explained, however, Applied is not entitled to recover such profits. Accordingly, any further proceedings before the Board will be limited to disposing of any other outstanding issues in connection with Applied's termination settlement claim.

## CONCLUSION

The decision of the Board holding that DLA breached its requirements contract with Applied is affirmed.

## COSTS

No costs.

AFFIRMED.

DYK, Circuit Judge, concurring in part and dissenting in part.

In the present contract the government undertook two relevant obligations: (1) to purchase its actual requirements from the plaintiff and (2) to accurately estimate its requirements. There was no breach of the first obligation, but the majority holds that the second obligation was breached because the government, either in bad faith or negligently, provided an incorrect estimate. I am in full agreement with the majority so far. Having found that the second obligation was breached, however, the majority unaccountably denies the plaintiff's claim for lost profits for the admitted breach. The measure of damages the majority uses is unsupported by our precedent and contrary to the general law of contracts. Moreover, it leaves the contractor completely uncompensated for the breach and provides almost no incentive for the government to avoid such breaches in the future. I respectfully dissent.

The majority cites no case in which there was a bad faith or negligent misrepresentation in a requirements contract but lost profits were denied. In *Everett Plywood & Door Corp. v. United States,* 190 Ct.Cl. 80, 419 F.2d 425 (1969), *Crown Laundry & Dry Cleaners, Inc. v. United States,* 29 Fed. Cl. 506 (Fed.Cl.1993), *Cactus Press/Power Enterprises, Inc.,* GPOBCA 20–99 (Bd. Contract App. Jan. 31, 2001), and *In re HKH Capitol Hotel Corp.,* ASBCA No. 47,575, 98–1 B.C.A. (CCH) ¶ 29,548, at 146,467, 1998 WL 34784 (Jan. 26, 1998), cited by the majority as support for denying lost profits, *ante* at 1340–1341, the plaintiffs did not seek lost profits for a governmental misrepresentation. Thus, those opinions' silence as to the possibility of lost profits recovery for misrepresentation is completely without significance.

In *Everett Plywood* the plaintiff contracted with the Forest Service to purchase timber on a parcel of government land for a price that would decrease over time, so that the plaintiff would pay less per unit for the timber the more timber it cut and purchased. 419 F.2d at 427. The

---

**5.** The case on which the Board relied for the proposition that Applied's breach damages may include anticipatory profits, *Carchia,* 485 F.2d 622, is inapposite. In *Carchia,* the government wrongfully terminated a construction contract for default. At the time, a wrongful default termination was treated as a breach of contract. As the Court of Claims stated, "[s]ince this was an old-style contract which did not provide that a wrongful default termination was to be considered a convenience-termination, plaintiff was entitled to anticipated profits for work not yet performed at the time it received the improper notice of default termination." *Id.* at 625. In *Carchia,* the government did not dispute entitlement to anticipated profits, only the amount of such profits.

government negligently misrepresented how much timber was on the parcel so that the plaintiff's average cost per unit was higher than it had contemplated. *Id.* at 429. The plaintiff sought a price adjustment, and our predecessor court awarded the difference between the per unit price the contractor had to pay for the timber it cut and the effective price per unit it would have paid for the timber if the contractor had been able to cut the quantity estimated by the Forest Service. *Id.* at 433. There is no indication that the plaintiff sought lost profits, and the opinion does not discuss or even mention a lost profits issue.

In none of the other cited cases involving negligent misrepresentation did the contractor seek lost profits. In *Crown Laundry*, the contractor sought only equitable adjustment of the contract, and the parties stipulated the actual dollar amount of damages at the outset were the contractor to prevail. 29 Fed.Cl. at 514. Likewise, in *Cactus Press*, the contractor sought only equitable adjustment of the contract price. The same is true of *HKH Capitol Hotel Corp.* 98–1 B.C.A. ¶ 29,548 at 146,471. The equitable adjustment sought by the contractors in those cases appears to have consisted mainly of increased costs associated with the unexpected volume. But in *Crown Laundry* the amount of damages was not disputed, and in neither *Cactus Press* nor *HKH Capitol Hotel Corp* did the Board find that the contractor was entitled to an equitable adjustment.[1] Those cases therefore did not reach the question of what measure should be used. The statements in each case that equitable adjustment of the contract price was available to the contractor (if it could establish that it was harmed by a negligently prepared bid) simply restated the claim asserted by the contractor. Those statements were not addressed to lost profits and have no bearing on lost profit recovery.[2]

Without a controlling precedent, this court "appl[ies] ordinary principles of contract construction and breach." *United States v. Winstar Corp.*, 518 U.S. 839, 871, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (plurality opinion); *accord Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934) ("rights and duties" of government contract "are governed generally by the law applicable to contracts between private individuals."). The majority must recognize that there is no controlling precedent in this area, as it observes that "[n]o case has been cited to us in which, under a requirements contract, a contractor was allowed to recover anticipatory profits as damages for a breach of contract resulting from negligently prepared estimates," *ante* at 1340, and then it cites no case in which, in that situation, lost profits have been denied. Accordingly, we must look to the general law of contracts.

As the majority recognizes, the rule in this area is that lost profits are available to the non-breaching party, assuming foreseeability. As we have said,

---

1. In *Cactus Press,* the Board rejected the contractor's claim because it was untimely. In *HKH Capitol Hotel Corp.*, the contractor's claim was barred because the contractor did not seek clarification of a patent ambiguity in the contract relating to the estimate. 98–1 B.C.A. ¶ 29,548 at 146,472

2. Equally inapplicable, so far as computation of damages is concerned, are the diversion

cases, when lost profits recovery is allowed because the government has improperly diverted orders to other sellers. *Ante* at 1336–1339 (discussing *Ace–Federal Reporters, Inc. v. Barram,* 226 F.3d 1329 (Fed.Cir.2000); *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756 (1982); *Locke v. United States,* 151 Ct.Cl. 262, 283 F.2d 521 (1960)).

"One way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred." *Glendale Federal Bank FSB v. United States*, 239 F.3d 1374, 1380 (Fed.Cir.2001) (citing Restatement (Second) of Contracts § 344(a)(1981)). A party's expectation interest is the "interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed." Restatement (Second) of Contracts § 344(a)(1981). *Expectation damages are recoverable provided they are actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty.* *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed.Cir.2001) (emphasis added). The leading authorities on contracts agree that the normal measure of damages includes lost profits. As it was put in the First Restatement of Contracts, "compensatory damages will be given for the net amount of the losses caused and gains prevented, in excess of savings made possible." Restatement (First) of Contracts § 329 cmt. a (1932). *See also* Arthur Linton Corbin, *Corbin on Contracts* § 992 (Interim ed. 2002) (quoting First Restatement with approval); Restatement (Second) of Contracts § 347 (1981).

To determine how to calculate the gains prevented by Defense Logistics Agency's ("DLA") breach, we should look to breach of warranty cases. If DLA had warranted to Applied Companies, Inc. ("Applied") that the requirements contract would provide 120,000 cylinders' worth of work, damages would be awarded to compensate the contractor for the benefit of the expected bargain, not for the value of the contract as it was without the misrepresentation. For example, the Uniform Commercial Code provides, "The measure of damages for breach of warranty is the difference ... between the value of the goods accepted and the value they would have had if they had been as warranted." UCC § 2–714(2) (1989). This is in keeping with the rule that "[o]rdinarily, the damages recoverable for a breach of contract are measured on the basis of the value of the *promised performance.*" Corbin, *supra,* § 1030 (emphasis added).

To be sure, in this case there was, in effect, only a warranty that the requirements were properly estimated; the quantity ordered could have been higher or lower. But such uncertainty, contrary to the majority's assertion, does not bar recovery. Although we have not specifically addressed the lost profits issue, we have repeatedly recognized that when the government allows bidding on either requirements or indefinite quantities contracts, it is reasonable and foreseeable for contractors to rely on government estimates. *Medart, Inc. v. Austin*, 967 F.2d 579, 581 (Fed.Cir.1992) ("[P]resumably contractors rely on the [government's] proffered estimates in formulating their bids, so the government must act in good faith and use reasonable care in computing its estimated needs"); *Clearwater Forest Indus., Inc. v. United States*, 227 Ct.Cl. 386, 650 F.2d 233, 239 (1981) ("[A] prospective purchaser should reasonably be expected to base his operating plans and cost estimates on [government estimates]"); *Womack v. United States*, 182 Ct.Cl. 399, 389 F.2d 793, 801 (1968) ("Assuming that the bidder acts reasonably, he is entitled to rely on Government estimates as representing honest and informed conclusions."). Indeed, it is the very purpose of quantity estimates to induce such reliance; otherwise, as our predecessor court said, the estimate would be "surplusage at best or deception at worst." *Womack*, 389 F.2d at 801.

Where such reliance is reasonable, "[i]f a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." *Ace–Federal Reporters, Inc. v. Barram,* 226 F.3d 1329, 1333 (Fed.Cir.2000) (*quoting Locke v. United States,* 151 Ct.Cl. 262, 283 F.2d 521, 524 (1960)). In circumstances in which the breach destroyed all value and made recovery under the contract impossible, courts have measured the value of the contract right at the time of the breach. Corbin, *supra,* § 1030; E. Allen Farnsworth, *Farnsworth on Contracts* § 12.15 (2d ed. 1998). So too, at the time the government made the contract with Applied, it was worth something definite, of which the government's estimate was highly probative. Alternatively, recovery could be based on other evidence of the contract value—how Applied valued the contract when it was signed, for example, or how other, similarly situated companies valued requirements contracts. *See* Farnsworth, *supra,* § 12.15. Taking into account expected variations from the estimate, the Board should award lost profits based on the amount of likely purchases given the estimate. It is particularly inappropriate for the majority to foreclose lost profit damages at this stage, before Applied has even had the opportunity to present evidence on the matter.

The majority holds that an award of lost profits would overcompensate Applied because, had the government disclosed its actual requirements, Applied would have either "submitted a bid" on the contract as it was or "declined to bid on the contract and thus made no profit at all." *Ante* at 1339. In short, the majority contends, it would have been impossible for Applied to recover the profits on this contract, because even absent the breach, Applied "would not have expected to sell, and it would not have sold, 120,000 cylinders." *Ante* at 1340. But that characterization removes the misrepresentation from the measure of damages, as if it had never happened. The famous Bristol Seed case, treated by Corbin, provides an illustration of the majority's approach. *Corbin, supra,* § 1026 (describing *White v. Miller,* 71 N.Y. 118 (N.Y.1877)). In that case, the buyer purchased seed from a seller who warranted that it was fit for human consumption. It was in fact mixed seed only good for animal feed. The buyer was due damages based on the difference between the value of the seed as warranted and the value of the actual seed, including lost profits. *Id.* Under the majority's theory of damages, however, the buyer could not recover expected profits because there would not have been any; the seed was unfit for human consumption.

Here the contractor assumed the risk that the government's requirements would actually be less than the estimate; the contractor did not assume the risk that the government's requirements estimate would be deliberately or negligently misstated. The majority's measure of damages thus effectively erases the breach. Far from "convert[ing] the contract ... to one in which DLA guaranteed Applied a certain level of business," as the majority asserts, *ante* at 1339, awarding lost profits merely reflects the general measure of damages.

The consequence of today's decision is that the government may misrepresent its requirements with impunity so long as the contractor suffers no increase in costs. That seems to me to be bad policy as well as bad law. I respectfully dissent.