ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -                                           )
                                                      )
D2 Government Solutions                               )   ASBCA No. 63030
                                                      )
Under Contract No. FA664-19-C-0001                    )

APPEARANCE FOR THE APPELLANT:          Jay R. Rodne, Esq.
                                         D2 Government Solutions
                                         New Bern, NC

APPEARANCES FOR THE GOVERNMENT:        Caryl A. Potter, III, Esq.
                                         Air Force Deputy Chief Trial Attorney
                                       Lawrence M. Anderson, Esq.
                                         Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE EYESTER
PURSUANT TO BOARD RULE 11

D2 Government Solutions (D2 or appellant) appeals a deemed denial of a certified claim concerning a contract issued by the United States Air Force (Air Force or government) for base operating services at March Air Reserve Base (ARB). The parties have agreed to waive a hearing and have the appeal decided on the written record pursuant to Board Rule 11. For the reasons set forth below, the appeal is denied.

FINDINGS OF FACT (FOF)

1. On March 23, 2018, the Air Force issued a solicitation for various base operations services at March ARB (R4, tab 1 at 1-60, 66). The solicitation included fixed-priced,[1] cost, and cost plus fixed-fee (CPFF) contract line item numbers (CLINs) and required an offeror's price proposal include a completed pricing matrix (*id.* at 1-60, 114). For the fixed-priced CLINs, offerors were to provide the unit price which would be multiplied by a quantity used for evaluation purposes only (*id.* at 114). For the cost and CPFF CLINs, offerors were to provide the hourly labor rates which were then multiplied by the listed estimated hours. The estimated hours were based on historical data, and the solicitation explained that these estimated hours were for evaluation purposes only (*id.* at 114-15, 119). Further, the solicitation stated that offerors were to complete pricing only for the fixed-priced CLINs in section B as the cost and CPFF CLINs would be funded at the discretion of the government (*id.* at 114).

---

[1] The fixed-priced CLINs were fixed unit prices based on a quantity of 12 months, used for evaluation purposes only (R4, tab 1 at 2-5, 114).

2. On October 4, 2018, the agency awarded D2 fixed-priced Contract No. FA466419C0001 in the amount of $8,106,974.20 for these services (R4, tab 2).[2] The performance period included a one-year base period (November 1, 2018 through October 31, 2019) and 4 one-year option periods (*id.* at 66-79). For the CPFF and cost CLINs, the government included the estimated costs for the base period (*id.* at 10-22).

3. Each contract CLIN correlated to an attached performance work statement (PWS) tab: tab A (general), tab B (supply), tab C (motor vehicle management), tab D (traffic management), tab F (real property management), tab G (fuels management), and tab H (airfield management) (R4, tab 2 at 2-10, 101).[3] For example, there were fixed-priced CLINs for base supply (tabs A and B), vehicle operations and maintenance (tabs A and C), traffic management operations (tabs A and D), real property maintenance (tabs A and F), fuels management (tabs A and G), and airfield management (tabs A and H) (*id.* at 2-10). The CPFF and cost CLINs were for service calls which included property maintenance calls (tabs A and F), enhancement work (tabs A and F), over and above work (tabs A, B, D, G, H) and materials (*see e.g., id.* at 10-20).

4. The PWS tabs play a key role in the contract and this appeal. Tab A explained that all services, labor, supplies, materials and parts were included in the fixed-price CLINs unless otherwise specified and during the phase-in, the contractor should be prepared to assume full responsibility for all areas of operation (R4, tab 3 at 8, 20). Tab C described the required vehicle maintenance services and included monthly average workload estimates for the various work orders (R4, tab 5 at 5, 18). Tab F described the required real property maintenance services, which included preventive and corrective maintenance service calls and "provided for information purposes only" workload estimates for the period of June 1, 2016 through May 31, 2017, for corrective maintenance calls (R4, tab 7 at 3, 22). Tab F stated that "[a]ll work identified in this Tab is included in the Firm Fixed Price unless otherwise specified" (*id.* at 3). For the preventive maintenance services performed, D2 was to maintain a file of all work accomplished, with documentation such as materials used, date, time and person completing actions; the file was to become the property of the government. Further, D2 was to submit written reports of work accomplished in the prior month to include specific information on the work completed. (*Id.* at 6) For corrective maintenance, D2 was to invoice the government after completion and acceptance of the work and the labor was to be paid at the applicable hourly rate under the service call CLIN (*id.* at 7). Tab G described the required fuels management

_____

[2] The contract was awarded to Onvoi LLC (R4, tab 2 at 1); however, on March 1, 2021, the parties executed a bilateral modification which recognized the change in name of Onvoi to D2 with an effective date of January 21, 2020 (R4, tab 34 at 2).

[3] There was no tab E (*see* R4, tab 2 at 101).

services and also included workload estimates based on monthly averages for fuel requirements (R4, tab 8 at 3, 9-11). The government would issue a work order--an "authorization to perform specific work"--to D2 when it required any of these services (*see* R4, tab 5 at 31).

5. The contract included Federal Acquisition Regulation (FAR) 52.217-8, OPTION TO EXTEND SERVICES (NOV 1999) (R4, tab 2 at 88). In addition, the contract incorporated by reference the relevant disputes clause and fixed-priced and cost reimbursement changes clauses (*id.* at 86).

6. Further, the contract incorporated by reference FAR 52.246-4, INSPECTION OF SERVICES-FIXED PRICE (AUG 1996) and FAR 52.246-5, INSPECTION OF SERVICES COST-REIMBURSEMENT (APR 1984), both of which require the contractor provide and maintain complete records of all inspection work it performed on the required services (R4, tab 2 at 65; FAR 52.246-4(b)&(d); FAR 52.246-5(b)&(d)). The contract also incorporated by reference FAR 52.232-1, PAYMENTS (APR 1984), requiring the government "pay the Contractor, upon the submission of proper invoices or vouchers, the prices stipulated in this contract for supplies delivered and accepted or services rendered and accepted, less any deductions provided in this contract" (*see* R4, tab 2 at 85; FAR 52.232.1). In addition, the contract included Defense Federal Acquisition Regulation Supplement (DFARS) 252.232-7003, Electronic Submission of Payment Requests and Receiving Reports (JUN 2012) (R4, tab 2 at 87). That clause defines an 'invoice payment' as a "government disbursement of money to a contractor under a contract or other authorization for supplies or services accepted by the government." DFARS 252.232-7003(a). Further, the contract incorporated in full DFARS 252.232-7006, WIDE AREA WORKFLOW [(WAWF)] PAYMENT INSTRUCTIONS (MAY 2013), which required the contractor utilize the electronic system for payment of invoices (R4, tab 2 at 80-81). D2 was to submit a "2-in-1" document with its payment requests but the contract fails to define or explain what this means. In addition, payment requests were to include appropriate CLIN descriptions of work performed or supplies delivered, the unit price, and relevant back-up documents as defined in DFARS, Appendix F (e.g., timesheets). (R4, tab 23 at 3) Appendix F does not explain what type of back-up documents are required.

7. There were several modifications to the contract. For example, on October 31, 2019, the parties executed a bilateral modification which, among other things, noted that D2 would not proceed with the option years but the government would issue a two-month extension (R4, tab 31 at 2). Later, the government unilaterally exercised its option to extend services pursuant to FAR 52.217-8, extending the contract by two months for a contract expiration date of December 31, 2019 (R4, tab 32 at 1). The modification obligated an additional $1,148,405.88 to the contract and stated D2 would be paid within the limits and at the rates specified in the

contract (*id.* at 1, 12). Later, the contracting officer modified the contract to increase the contract price by $8,219.89 due to wage increases for the fixed-priced CLINs for the two month extension period (R4, tab 33 at 1).

8. On May 15, 2020, several months after D2's contract ended, the contracting officer notified D2 it was closing out the contract and requested a statement that all invoices and requirements on the contract were satisfied (R4, tab 41 at 3). The contracting officer followed up again on June 4, 2020 (*id.* at 2). In response, D2 stated the government owed it money and it intended to file a claim (*id.* at 1). Over a year later, the contracting officer emailed D2 and stated it was still waiting for D2's claim (R4, tab 42 at 1).

9. In the meantime, the government prepared a contractor performance assessment report (CPAR) dated January 18, 2021, and rated D2 as "marginal" for quality, schedule and management, and "satisfactory" for cost control, small business subcontracting and regulatory compliance (R4, tab 71 at 3, 7). The CPAR discusses several concerns with D2's performance. For example, with respect to tab F management, the government stated D2 "refused to purchase materials or pay for subcontractors to execute high priority/high dollar preventative and corrective maintenance actions that fell under their responsibility," which led to a backlog of 395 incomplete corrective maintenance tasks. Further, in the CPAR the government stated there were incomplete work orders, including malfunctioning HVAC systems at the air traffic control tower. (*Id.* at 5) With respect to the tab F schedule, the government stated that D2 failed to submit approximately 70 data deliverables, submitted 24 late, and submitted 9 incomplete, out of a total of about 197 required throughout the contract period (*id.* at 4). D2 agreed with the assigned ratings (*id.* at 7).

10. On June 27, 2021, D2 submitted to the contracting officer a certified claim seeking $366,130.53 as follows: $237,809.88 for materials and labor delivered; $90,383.47 for supporting materials and services; and $37,937.18 for interest charges on funds to pay for these materials and labor (R4, tabs 43 at 1; 44 at 1, 3). In its claim, D2 made several allegations regarding the government's handling of the contract. However, there are only four main arguments in support of the claim.

11. First, D2 argued the incumbent did not assist with the transition and, in fact, took the work order and job costing database, referred to as ACES,[4] with them (R4, tab 44 at 1). Since the ACES database was not immediately available, D2 had to manually record each work order. Once the database was restored after two months, D2 failed to record numerous work orders for materials and labor and therefore was never paid. (*Id.* at 2).

---

[4] ACES was the system used to manage, process and reconcile invoices and work orders (see app. br. at ex. A, Chief of Contracting (CoC) depo. tr. at 47).

4

12. Second, D2 alleged that when it began the contract, it had to complete numerous delayed work orders left by the incumbent, including delayed material orders which required D2 supply the replacement parts. D2 argued the solicitation failed to define the condition of the equipment and the material responsibilities of the contractor, and therefore D2 underbid the contract. Further, D2 contends the government disallowed the costs for any material handling and general and administrative markup on the materials. D2 alleges it submitted several requests for equitable adjustment (REAs) for these materials, and the government used them, but never paid D2. (R4, tab 44 at 2)

13. Third, D2 alleged that while it received several notices from the government regarding insufficient manpower, it provided a labor work force based on historical workload provided in the solicitation. D2 argued that the workload was inaccurate for tabs B, F and G, and it hired additional personnel expecting reimbursement by the government. (R4, tab 44 at 2)

14. Finally, D2 alleged it was not paid for certain work performed because when the new contractor arrived, D2 no longer had access to the ACES database to wrap up costs and could not bill for the final three months of performance. D2 states that during this time, some of the work fell under the Davis-Bacon Act (DBA) and the government never approved these work orders. (R4, tab 44 at 2). According to a declaration by David Ricker, a co-owner of D2, when the contract ended, the company went through a significant transition, relocated, lost key personnel, and lost records including vendor receipts, work orders and invoices generated during the contract (app. br. at attach., Ricker aff. ¶ 10).

15. On June 28, 2021, the contracting officer informed D2 that the government could not process the claim without further information. Specifically, the contracting officer requested comprehensive spreadsheets showing: all claims by corrective maintenance work order package; applicable CLINs in which each claim for reimbursement was to be charged against; all claims by the respective preventive maintenance CLIN and the description of the claim; a breakdown of individual costs associated with the supporting material and services equating to $90,383.47; and all charges, calculations, formulas, description of work, subcontractors, etc., used for the claim of $366,130.53. (R4, tab 45 at 1)

16. In response, on July 8, 2021, D2 stated it could not substantiate its claims because it no longer had access to the ACES database. D2 stated that it "was denied access to the data base in December 2019 and therefore was unable to reconcile outstanding work." (R4, tab 46 at 1). D2 therefore requested the government provide copies of all tab F work orders entered into ACES from October 1, 2018 through February 28, 2020; records of work orders opened and closed during normal working

5

hours requiring D2 pay overtime; records from ACES of all DBA work orders with hours and materials procured; copies of justifications for rejection of all REAs; copies of all materials ordered and received for tab C; dates fuel pits were closed thereby requiring fuel delivery via truck; and copies of justifications for approval of contractor manpower for tab B. (*Id.* at 2)

17. On September 15, 2021, D2 filed its notice of appeal with the Board based on a deemed denial by the government. In what appears to be an effort to assist D2 with its claim, on September 21, 2021, the contracting officer stated he sent D2 a file of all D2 work order records listed in ACES for 14 months and could not determine what had been approved for payment, what was rejected and what had not been billed by the time the new contractor took over on January 1, 2020 (R4, tab 68 at 1). The contracting officer offered D2 the opportunity to submit all supporting documents for unbilled but identified ACES work orders to support the claim, hire the current contracted "Tab Manager" to go through all of the unbilled work orders and match it with ACES, or send their own person to do this. The contracting officer stated that D2 must provide supporting documents such as parts/materials receipts, estimates, labor hours with labor categories, payroll data for the DBA claim and an organized spreadsheet supporting all the related charges per unbilled work order broken out by labor and material charges. (*Id.* at 2)

18. On March 7, 2022, D2 sent an unsigned letter to the contracting officer supplementing its claim and notifying the government of additional amounts owed for a total of $785,266.87 (R4, tab 72). According to D2, the government owed $80,398.41 for tab F work orders; $12,799.66 for tab F invoicing reductions; $17,049 for collective bargaining agreement rate increases for mid-year 2019; $154,835 for tab C for overtime for performing maintenance services; $6,265.61 for tab F for an additional clerk to perform ACES reporting and preparation; $27,991 for tab G for fueling staff due to the closure of fuel pits and the need for overtime; $98,837 for overtime for employees during the base year; $357,543.68 for expenses for shutting down the contract; and $29,547.51 for interest on unpaid claims (*id.* at 1-4).[5] The contracting officer treated this as an update to the original claim and not a new claim (gov't br. at attach., Contracting Officer aff. ¶ 6).

19. The government sought the assistance of the Defense Finance Accounting Service (DFAS) to resolve the claim and appeal. On June 7, 2022, DFAS provided its audit results and concluded that while $1,157,496.82 remained on the contract, all invoices that the government approved as having adequate documentation had been paid (R4, tabs 73-75). Of the total amount remaining on the contract, $43,451.23

---

[5] The total amount requested here is $785,266.87, which differs from the total of $768,235.36 in the summary on the first page of the amended claim (*see* R4, tab 72).

6

related to fixed-priced CLINs 01-10; $1,031,172.04 for CPFF CLINs 12-18; and $82,873.55 related to cost-reimbursement CLINs 019-028 (R4, tab 74). The contracting officer contends that this remaining money relates to CLINs that required invoice substantiation, generally because the work done involved cost reimbursable, non-recurring, corrective maintenance work orders (gov't br. at attach., Contracting Officer aff. ¶ 10). We note that CPFF CLINs 12-18, where the bulk of the funding remained, were for service calls or enhancement work for tabs A and F (R4, tab 2 at 10-16). The record shows that invoices were submitted, updated and received throughout the contract period, including in October 2019 through January 2020 (R4, tab 75 at 6-8, 10-11). Although not many invoices were submitted in December 2019, there were some submitted in late December 2019 and early January 2020 (*id.* at 10-11).

20. In June 2022, D2 submitted new invoices to the government, summarized as follows:

| CLIN | Description | Month/Year Work Orders | Amount |
|------|-------------|------------------------|--------|
| 0004 | Tab F | | 12,799.66 |
| 0012 | Tabs A & F | 10/19 | 23,487.31 |
| 0012 | Tabs A & F | 11/19 | 7,869.11 |
| 0013 | Tabs A & F | 10/19 | 260.50 |
| 0014 | Tabs A & F | 10/19 | 2,448.14 |
| 0014 | Tabs A & F | 11/19 | 2.352.94 |
| 0015 | Tabs A & F | October 2019 | 140.14 |
| 0015 | Tabs A & F | Contract Shutdown | 141,810.75 |
| 0017 | Tabs A & F | Contract Shutdown | 174,797.66 |
| 0018 | DBA rates to include labor and material | 10/19 | 13,862.16 |
| 0018 | DBA rates to include labor and material | 11/19 | 31,940.45 |
| 0018 | DBA rates to include labor and material | 12/19 | 11,519.52 |
| | REA Request for CB Rate Increase | | 17,049 |
| | Tab C REA Request for Additional Staff | | 154,835 |
| | Tab F REA for Additional Staff | | 6,265.61 |
| | Tab G REA for Additional Staff | | 27,991 |
| | REA for Overtime Paid to Employees | | 98,837 |

(R4, tabs 2 (CLIN descriptions), 77-78). The invoices totaled $728,265.95, which is different from the claim amount, and we are unable to reconcile these invoices with the claim and amounts set forth in the updated claim. The invoices do not include any supporting information but merely state the information summarized above.

7

21.    The government has not paid these invoices because there is no supporting documentation (gov't br. at attach., Contracting Officer aff. ¶¶ 10, 13).  For example, the contracting officer explains there is not even a breakdown of some of these amounts, *e.g.*, D2 requested a total of $141,810.75 for CLIN 015 shutdown costs without an explanation of what comprised this amount (*see* R4, tab 78 at 3; gov't br. at attach., Contracting Officer aff. ¶ 10).  The government included in the Rule 4 file an example of invoices D2 previously submitted, and which were paid, because they included back-up documentation such as a worksheet identifying each work order, description of work performed, facility, shop code, total material cost, total labor costs and supplier receipts (R4, tab 70; gov't br. at attach., Contracting Officer aff. ¶ 9).  The contracting officer states there is no proof the work was performed by D2, including in the last three months (gov't br. at attach., Contracting Officer aff. ¶¶) 11-13).

22.    Since it has no records to support its appeal, D2 relies solely on the deposition of the former Chief of Contracting (CoC) Ms. York who had knowledge of the contract beginning in March 2019.  The CoC explained that there were three contracting officers involved in the contract--herself, the contracting officer at March ARB, and the contracting officer who awarded the contract (app. br. at ex. A, CoC depo. tr. at 8).  While she heard from D2 they had to perform transaction activities prior to the start of the contract. she was not actually present during that time period (*id.* at 9).  With regard to pre-contract activities, the CoC stated that while doing some administrative items such as obtaining a CAC card is permissible, performing any more than that was not and was a practice stopped at March ARB (*id.* at 10).  We find these statements by the CoC insufficient evidence that D2 performed activities before the start of the contract, and even if it did, what activities it actually performed.

23.    The CoC also discussed several issues of which she was aware and we discuss a few here.  The CoC stated that when the prior contractor left, there was a backlog of work orders for tab F not disclosed in the RFP and D2 had to perform the work (app. br. at ex. A, CoC depo. tr. at 23).  The CoC stated this was the biggest issue from a contracting perspective because the backlog forced D2 to purchase materials, such as generators, to complete those work orders (*id.* at 41)  However, she noted that D2 should not be reimbursed if they performed those work orders as they arose and part of D2's contract but should be reimbursed if they performed those work orders *and* new work orders under D2's contract (*id.* at 42).  Again, while the CoC confirms there was a backlog of work orders when D2 began the contract, she also confirms that D2 may have just performed these work orders as required pursuant to the fixed-priced contract.

24.    The CoC also stated that issues relating to tab G were not settled prior to the contract ending and she "can confirm that there were requirements not on the PWS or disclosed at the time of RFP for [D2] to have proposed to that the Government did not address" and that included the airfield's fueling stations (app. br. at ex. A, CoC

depo. tr. at 11-12). According to the CoC, D2 had to incur additional time and travel because an airfield was shut down, and D2 had to take care of airfield lighting (*id.* at 12-15). The CoC believed D2 should be reimbursed for the backlog of supplies under this tab but also noted the government furnished D2 a crane which they kept (*id.* at 20-21). The CoC recalled some other tab G issues, but noted in some cases the issue was resolved (*e.g.*, broken fuel slosher) (*id.* at 16-17). We find that although the CoC recalled certain issues with materials and equipment under PWS tab G, she also stated the government gave D2 a crane and resolved at least one of the issues; further, it is not clear what contract sections are at issue and whether any of these issues relate directly to the claim.

25. Further, the CoC stated there was an open issue regarding collective bargaining agreement (CBA) rates and while she recommended the government approve payment to D2 for the updated CBA rates for the first year due to issues with the RFP, it was denied (*id.* at 27-28). The CoC stated that there was no actual claim by D2 on which she "didn't, in some part, agree with" (*id.* at 34). However, she acknowledged D2's issue was putting together a claim proposal which could explain their costs (*id.* at 35). The CoC did believe that D2 was not reimbursed or compensated for all of its services (*id.* at 57-58). However, she was not involved in the review of individual invoices for payment (*id.* at 55).

26. Finally, the CoC heard from the procuring contracting officer that D2 had issues accessing ACES during the phase-out but she did not know the length of time or impact. She confirmed that having access to ACES was critical for processing work orders as its was "the only avenue." (App. br. at ex. A, CoC depo. tr. at 52) The CoC did not know whether D2 was allowed access to ACES when the successor contract was awarded, and she believed neither D2 nor its successor performed phase-out/phase-in activities as planned as the successor filed a claim on the matter (*id.* at 53-55). We find that while the CoC expresses support for some of D2's claims, her statements fail to reference any specific part of the contract or an REA, or really anything with specificity, and most of her opinions lack actual knowledge.

27. To some extent, D2 also relies on a deposition of Ms. Morris, the administrative contracting officer (ACO). She stated several times that she was not the final decision maker regarding any claims but did discuss several REAs (app. br. at ex. B, ACO depo. tr. at 11, 18-19). In reviewing documents provided but offering no details on them, the ACO stated that an REA for four full-time equivalents (FTEs) under tab B was denied; the request for money for ACES was denied because the contractor did not respond to the government's request for information; the request for seven FTEs under tabs B and G were granted because D2 received a monthly increase on the remainder of the contract; a request for general administrative expenses due to the insourcing of the airfield manager position was granted; the request for wage

9

increases relating to the CBA was granted; and a request for overtime was denied (*id.* at 25-32).

28. With respect to the backlog under tab F, the ACO explained that D2 was paid for the work orders performed whether due to a backlog or current work (*id.* at 33). The ACO recalled from reading the claim that D2 did not get paid for the last month of the contract because they did not submit invoices, and they did not get paid for the fees they were entitled to because they never invoiced them (*id.* at 37, 39, 45). She did not believe the government received any services "for free" from D2 and the only outstanding issue she was aware of related to the last month of invoices (*id.* at 39). The ACO iterated that this was a fixed-priced contract and the government did not tell D2 how many people to employ (*id.* at 40). Further, the ACO stated that D2 was on the contract until the end of December and the successor did not take over until January, so she doubted that the successor denied D2 access to the ACES database (*id.* at 43). With respect to documentation on invoices, the ACO explained that D2 was required to submit the work orders performed showing the work completed, the work performed, and whether it had been approved (*id.* at 45). For something like the unpriced change order, D2 only had to submit an invoice citing the amount and the modification providing them the money (*id.* at 46).

DECISION

As noted, this appeal is proceeding under Board Rule 11, which allows the parties to waive a hearing and instead have the Board issue a decision based on the record. Board Rule 11(a). Utilization of Board Rule 11 procedures "does not relieve the parties from the necessity of proving the facts supporting their allegations or defenses." *Id.* In addition, the Board's rules explain that "[t]he weight to be given to any evidence will rest within the discretion of the Board." *Id.* at 11(d). Accordingly, the Board "may make findings of fact on disputed facts." *U.S. Coating Specialties & Supplies, LLC*, ASBCA No. 58245, 20-1 BCA ¶ 37,702 at 183,031 (quoting *Grumman Aerospace Corp.*, ASBCA No. 35185, 92-3 BCA ¶ 25,059 at 124,886 n.13).

In its briefs, D2 argues it was injured when the government breached the contract and as a result, is entitled to breach damages (app. br. at 10-11). Specifically, D2 alleges the following, based on testimony from the former CoC: (1) it was financially harmed by incurring pre-contract transition activities for which it was never compensated and were not part of the contract; (2) it inherited a significant work order backlog requiring expenditures for equipment and material that were not disclosed in the solicitation; (3) it incurred severe cash flow problems due to the government's chronic untimeliness in the payment of invoices; and (4) it was unable to submit invoices in the ACES database, especially during the final three months of the contract (app. br. at 11; *see* amended compl. ¶¶ 6-13). In its amended complaint, D2 further argued that the program office disallowed material handling and general and

administrative mark-up on materials and it had to increase its workforce because the solicitation's historical workload was inaccurate (amended compl. ¶¶ 9-10). D2 seeks $768,235.36 for all of this (*id.* ¶ 18).

The elements of a breach of contract claim are: (1) a valid contract between the parties; (2) an obligation or duty on the part of the government arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach. *Lockheed Martin Integrated Sys., Inc.*, ASBCA Nos. 59508, 59509, 17-1 BCA ¶ 36,597 at 178,284. It is the appellant's burden to prove each element. *Action Support Serv. Corp.*, ASBCA No. 46800, 00-1 BCA ¶ 30,701 at 151,682.

While we address each argument below as they relate to the claim, we note that in many instances the claim and appeal do not align. We have tried to understand D2's various arguments and correlate D2's claims with the record, its complaints, and its briefs. But our efforts can only go so far. Ultimately, we conclude that D2 fails to offer any substantiation for its appeal, something it also realizes. Therefore, D2's true argument is that based on the CoC's statements that D2 was injured in some way, and the fact that money was left on the contract, it is owed money based on the jury verdict method (app. br. at 12-15). We address that argument, as well.

*1. Tab F Work Orders ($80,398)*

According to D2, when the contract ended and a new contractor took over, D2 was no longer allowed access to the ACES database to wrap up final costs and this precluded any billing of materials and labor during the final three months of the contract (R4, tab 72 at 2). D2 reconciled the October-December 2019 tab F work orders by identifying the CLIN (012-015, 018), and then subcontracting the invoices paid from the total ACES work order summary to obtain an amount allegedly owed to D2 (*id* at 2-3). D2 contends that the ACO conceded that D2 did not have access to ACES and was not paid for work for the month of December 2019 (app. br. at 7 (citing ex. B, ACO depo. tr. at 26, 37)).

The government argues that D2 has not shown it completed the work orders under the listed CLINs. Further, without documentation, the government states it cannot reconcile the invoices to the work orders and understand why certain work orders were not paid (*e.g.*, incomplete or disputed work). (Gov't br. at 12-13) According to the government, D2 submitted proper invoices prior to the dispute, with supporting documents, which were approved, and D2 needs to do the same with any remaining unpaid invoices (*id.* at 15-17) (quoting *id.* at attach., Contracting Officer aff. ¶¶ 9-10).

D2 has failed to meet the burden of proof that it is owed the money for Tab F work orders. With respect to the alleged lack of access to the ACES database, D2 first

relies on the CoC's statements that she heard from the procuring contracting officer[6] that D2 had issues accessing ACES during the phase-out; but she also stated she did not know the length of time or impact (FOF ¶ 26). D2 also relies on the ACO's statements that while the ACO heard *from the claim* D2 did not get paid for the last months of the contract because they failed to submit invoices, she also stated that D2 was on the contract until the end of December so she doubted that the successor denied D2 access to the ACES database at that time (*id.* ¶ 28). Neither individual had specific knowledge of D2's access to ACES or the work performed for which D2 was not paid. In addition, the DFAS audit/spreadsheet shows D2 submitted invoices and was paid in October through December 2019 (some for Tab F but most for the other tabs) which means they could somehow submit invoices at the time in question (*id.* ¶ 19). Further, after the contract ended, the contracting officer reached out to D2 about contract close-out and provided D2 several opportunities to submit invoices for the work (*id.* ¶¶ 8, 15, 17) so even if D2 did not have access to the database in December, it had ample opportunity to submit invoices later. In fact, the contracting officer offered D2 the opportunity to hire the current contracted Tab Manager to go through all of the u.nbilled work orders and match it with ACES or send their own person to do this (*id.* ¶ 17).

D2 admits it lacks documentation to support any tab F invoices (app. reply at 5) and explains it had this supporting information but lost it (FOF ¶ 14). Further, D2 has provided several versions of amounts allegedly owed by the government for Tab F work orders (*see* FOF ¶¶ 10, 18, 20), which means it can manage to calculate these amounts but cannot seem to provide or cite to any information supporting them. And while it is not entirely clear from the contract what exactly must be submitted to support invoices for the CLINs, the contract did require D2 retain information about the work it performed (FOF ¶¶ 4, 6) and the record shows D2 had submitted supporting information previously (*id.* ¶ 21).

Considering all of this, we conclude D2 has failed to meet its burden and show the government breached the contract by failing to pay D2 for these tab F work orders. D2 has not shown the government denied it complete access to ACES or that D2 actually performed the work (and it was accepted). Accordingly, this allegation is denied.

---

[6] This is obviously hearsay, but the Board permits the consideration of hearsay so long as it is reliable and "convincing to a reasonable mind." *See Hamp's Constr. LLC*, ASBCA No. 62257, 24-1 BCA ¶ 38,514 at 187,201 (citations omitted). The problem for D2 here is not that this testimony is hearsay, but that it conveys so little specific factual information.

## 2. Tab F Invoicing Reductions ($12,799)

According to the claim, the government directed D2 to reduce "Tab F CLIN 0004 Real Property Maintenance invoices for Nov and Dec 2018 by $6,399.83" and D2 is owed $12,799.66 (R4, tab 72 at 3).  D2 states that this tab was a fixed-priced CLIN for services and not for full-time equivalents or hours and therefore D2 should be paid the correct invoice amount (*id.*).  D2 failed to provide specifics regarding the invoice number or cite to any documents and has failed to address this issue in its complaint or brief.  We therefore conclude the allegation is unsupported and again, D2 fails to meet the burden of proof that the government breached the contract.

## 3. REA Claims ($287,946)

In its claim, D2 explains that during the last quarter of the base year, the union filed several grievances against D2 for personnel shortages impacting job performance and overtime.  D2 states the union was "perplexed" as to why D2 did not hire the entire union staff upon award.  D2 contends it bid based on the historical workload set forth in the solicitation.  (R4, tab 72 at 3)  It then listed a break-down of the amounts sought for each subclaim, as follows.

### a. REA for CBA Rate Increase ($17,049)

According to D2, there was a rate increase based on its CBA that "took effect mid-year 2019" and the government denied the REA for this (R4, tab 72 at 3).  The government contends it has no record of this REA (gov't br. at 13).  D2 failed to provide specifics regarding the REA or cite to any documents such as the REA or CBA and has failed to address this issue in its complaint or brief, including legal support for its allegation.  Further, the deposition testimony of the CoC and ACO, relied upon by D2, conflict on this matter as one believed an REA for CBA adjustments was denied and the other believed it was granted (FOF ¶¶ 25, 27).  And our review of the record shows the contracting officer modified the contract to increase the contract price by $8,219.89 due to wage increases for the fixed-priced CLINs for the two-month extension period (FOF ¶ 7).  We therefore conclude the allegation is unsupported and D2 fails to meet the burden of proof the government breached the contract.

### b. Tabs C, F and G REAs for Additional Staff and REA for Overtime

In its claim, D2 asserts that it submitted an REA for tab C additional staff in the amount of $154,835 to support a greater workload than assumed based on the historical workload set forth in the solicitation (R4, tab 72 at 3).  D2 also asserted it funded an additional clerk to support work order processing under tab F ($6,265.61), additional fueling staff due to closure of fuel pits and need to pay overtime under tab G

13

($27,991), and overtime pay during the base year necessary to execute the mission ($98,837) (*id.* at 3-4).

In its brief, D2 argued that it handled a backlog under tab F once it began performance and did not build these costs into its proposal (app. br. at 2-3). It also argued that it had to increase personnel and support overtime under tabs B, F, G and H because the solicitation workload was inaccurate (*id.* at 6). The government argues D2 failed to identify a legal theory that would make the government liable for increases in performance costs based on historical workload data the government may have provided, failed to present evidence of the data provided, and failed to provide proof it relied on the data or incurred costs due to reliance on the data (gov't br. at 13).

The solicitation explained that for the CPFF CLINs offerors were to provide the hourly labor rates which were then multiplied by the listed estimated hours that were based on historical data and to be used for evaluation purposes only (FOF ¶ 1). Further, the contract for tab F described the required real property maintenance services, and included workload estimates for the period of June 1, 2016 through May 31, 2017, that were "provided for information purposes only." Tab G described the required fuels management services and also included workload estimates based on monthly averages for fuel requirements. (*Id.* ¶ 4)

The government is not required to be "clairvoyant when it issues an estimate for bidding purposes, but a contractor can recover if it shows that the estimate was inadequately or negligently prepared, not in good faith, or grossly or unreasonably inadequate at the time the estimate was made." *Burnham Assoc., Inc.*, ASBCA No. 60780, 18-1 BCA ¶ 36,934 at 179,942 (citing *Clearwater Forest Indus., Inc. v. United States*, 650 F.2d 386, 395 (Ct. Cl. 1981)). Including an inadequately or negligently prepared government estimate in a solicitation or contract, without correction, constitutes a misrepresentation amounting to a breach of contract. *Rumsfeld v. Applied Companies, Inc.*, 325 F.3d 1328, 1335 (Fed. Cir. 2003) (citing *Womack v. United States*, 389 F.2d 793, 800 (Ct. Cl. 1968)). As D2 takes issue with the data provided here, we interpret its claim as one for breach based on negligent misrepresentation.

To prevail on such a claim, D2 must demonstrate "(a) misrepresentation in the Government proffered estimates, whether intentional or negligent, (b) reliance thereon, and (c) resulting injury." *Am. Gen. Trading & Contracting WLL*, ASBCA No. 56758, 12-1 BCA ¶ 34,905 at 171,638 (quoting *J.A. Jones Mgmt. Services, Inc.*, ASBCA No. 46793, 99-1 BCA ¶ 30,303 at 149,833). Fixed-priced contracts may be subject to a negligent estimate claim since the issue is whether the "estimates of volume are material to the contract." *Am. Gen. Trading & Contracting, WLL*, ASBCA No. 56758, 14-1 BCA 35,587 at 174,378 (quoting *Rumsfeld v. Applied Companies, Inc.*, 325 F.3d 1328, 1340).

D2 has not provided specific evidence that the Air Force was negligent with its estimates for tab C and in fact, does not address this issue for tab C in its briefs at all. As for tab F, D2 relies on the CoC's statement that when the prior contractor left, there was a backlog of work orders for tab F not disclosed in the RFP and D2 had to perform the work which forced D2 to purchase materials to complete those work orders. However, we found that while the CoC believed there was a backlog, she also confirmed that D2 may have just performed these work orders as required pursuant to the fixed-priced contract. (FOF ¶ 23). ACO Morris stated that D2 was paid for the work orders performed (including the backlog) (*id.* ¶ 28).

For tab G, the CoC stated that there were requirements not on the PWS or disclosed at the time of solicitation regarding the airfield's fueling stations. We found that she failed to explain the specific parts of the contract which were the issue and did not state or explain that D2 actually incurred additional costs for any of these issues, but only needed additional time. (FOF ¶ 24)

D2's conclusory allegations are unsupported as they fail to cite any documents, including even the solicitation or contract, evidencing the agency misrepresented the estimates included in the solicitation or that they were negligently prepared. The mere fact there may have been a disparity between the estimates provided in the contract and the actual workload is insufficient to constitute a misrepresentation of data by the government and therefore breach of contract. *LBM, Inc.*, ASBCA No. 39606, 91-2 BCA ¶ 24,016 at 120,256.[7]

*4. Contract Shutdown ($357,543)*

D2 seeks $357,543 for shutdown costs, explaining that the March ARB contracting officer was unwilling to resolve funding issues and as a result D2 declined execution of the option year and did not participate in the follow-on competition. D2 further states that during the life of the contract, it had a total loss of $735,407.36 and during the month of January 2020 had shutdown costs of $357,543 which were primarily related to fringe payout and unpaid material purchases. (R4, tab 72 at 4)

The government notes that D2 failed to provide payroll records evidencing the fringe costs or the basis for the government paying for them, or any purchase invoices

---

[7] D2 also failed to show reliance or injury as the CPAR, which D2 did not disagree with, stated that for tab F, D2 failed to purchase materials or pay for subcontractors to execute high priority/high dollar preventative and corrective maintenance actions which led to a backlog of 395 incomplete corrective maintenance tasks and some incomplete work orders. Further, D2 failed to submit approximately 70 data deliverables, submitted 24 late, and 9 incomplete out of a total of about 197 required. (FOF ¶ 9)

substantiating the materials costs (gov't br. at 14). We agree; however, we believe the claim on contract shutdown relates to D2's argument that it inherited a significant work order backlog under tab F, requiring expenditures for equipment and material that were not disclosed in the solicitation (app. br. at 2-4). D2 states that because it was unaware of the backlog, it did not build these costs into its proposal, and it had to acquire expensive equipment like generators and HVAC systems (*id.* at 3). While we addressed this issue above for specific tabs under the theory of negligent misrepresentation, we looked at this allegation as a constructive change claim. To recover under a constructive change theory, the appellant must demonstrate that 1) it performed work beyond the requirements of the contract; and 2) the additional work was ordered by the government. *See, e.g., Bell/Heery v. United States*, 739 F.3d 1324, 1335 (Fed. Cir. 2014). Unfortunately, even under this theory D2 loses as it makes only conclusory allegations and fails to identify specific services it performed and/or how they were beyond the requirements of the contract. [8]

### 5. *Jury Verdict Method*

Last, D2 argues that the Board should find entitlement based solely on the CoC's statements and grant D2 its entire claim amount, plus interest, based on the jury verdict method. According to D2, its total revenue on the contract was $7,832,918.30, its total expenses were $8,407,350.24, and therefore it had a net income or loss of $574,431.94 (app. br. at 9, 12) (citing attach., Ricker aff. ¶ 13). D2 further explains that using a bid approved markup equaling $313,316.73, and the delta between the total revenue and total expenses, there is a total loss of $887,748.67 on the contract (*id.* at 9, 15). D2 argues, as above, that this loss occurred mostly in the last few months as it had persistent problems with accessing ACES to input and process its remaining invoices (*id.* at 9, 12, 15). D2 also contends the DFAS audit supports its analysis because it revealed that $1,157,496.82 was left remaining and unpaid on all CLINs of the contract (*id.* at 9, 15). D2 argues this comports with its internal analysis that the government continues to owe D2 at least $768,235.36 for work performed largely during the final three months of the contract (*id.* at 9, 12, 15) (citing attach., Ricker aff. ¶ 15).

---

[8] Assuming this claim relates to D2's argument it was required to perform pre-contract activities (*see* app. br. at 4, 11), we deny the claim on this basis, as well. D2 alleges it held meetings and had to familiarize itself with work processes and inspect equipment, which it believes are more than routine administrative tasks (app. br. at 4; attach., Ricker aff. ¶ 4). D2 primarily relies on the former CoC's statements to support this argument; however, we found those statements were insufficient evidence that D2 performed such activities or what these activities were (FOF ¶ 22). The government argues that D2 presented nothing in support of its allegations (gov't br. at 15). D2 failed to respond in its reply brief. We conclude that D2 failed to allege with specificity or provide any evidence showing what work it actually performed prior to the contract's start date.

The "guesstimate" of the jury verdict method is disfavored and may only be used when more exact methods cannot be applied. *Dawco Constr., Inc. v. United States*, 930 F.2d 872, 880-81, *overruled on other grounds by Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995). In order to adopt the jury verdict method, the Board must consider the following: "(1) that clear proof of injury exists; (2) that there is no more reliable method for computing damages; and (3) that the evidence is sufficient for the Board to make a fair and reasonable approximation of the damages." *Grumman Aerospace Corp. v. Wynne*, 497 F.3d 1350, 1358 (Fed. Cir. 2007) (quoting *Dawco*, 930 F.2d at 880). With respect to the second prong, D2 must show a "justifiable inability to substantiate the amount" of the injury by direct and specific proof. *Dawco*, 930 F.2d at 881.

D2 contends all records, copies of receipts and other key information regarding invoice processing was on a computer terminal provided to D2's successor and D2 did not have access to process the remaining invoices after December 2019 (app. reply br. at 4-5). We addressed above, and disagreed with, D2's conjecture it was completely denied access to ACES. D2 further contends it lost the relevant documents (FOF ¶ 14). Even if we found clear proof of injury, which we did not, D2 has not shown there is no more reliable method for computing damages. It is unfortunate that documents were lost or missing but that is not a justifiable inability to substantiate its injury. *See Am. Boys Constr.*, ASBCA No. 60515, 17-1 BCA ¶ 36,856 at 179,590 ("Such work-arounds as the 'jury verdict' method are unavailable to us when the contractor's failure to produce substantiation of damages is not due to a 'justifiable inability' to produce such evidence, but is caused by a lack of effort by the contractor."). The contract stated that D2 was to retain these documents (FOF ¶¶ 4, 6) and it did not; D2 bears the burden of proof here. D2 has not even stated it tried to recreate its damages. Thus, the jury verdict method is unavailable to D2.

CONCLUSION

Based on the foregoing, the appeal is denied.

Dated: October 10, 2024

LAURA EYESTER
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63030, Appeal of D2 Government Solutions, rendered in conformance with the Board's Charter.

Dated:  October 10, 2024

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals